USCA1 Opinion

 

 United States Court of Appeals For the First Circuit ____________________ No. 95-2032 UNITED STATES OF AMERICA, Appellee, v. ROBERT M. JOOST, Defendant, Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF RHODE ISLAND [Hon. Mary M. Lisi, U.S. District Judge] ___________________ ____________________ Before Lynch, Circuit Judge, _____________ Coffin, Senior Circuit Judge, ____________________ and Cummings,* Circuit Judge. _____________ ____________________ Thomas G. Briody for appellant. ________________ Margaret E. Curran, Assistant United States Attorney, with whom ___________________ Sheldon Whitehouse, United States Attorney, and Kenneth P. Madden, __________________ __________________ Assistant United States Attorney, were on brief for appellee. ____________________ August 7, 1996 ____________________  ____________________ *Of the Seventh Circuit, sitting by designation. COFFIN, Senior Circuit Judge. Defendant Robert Joost ______________________ appeals his conviction for being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. 922(g). He raises four issues: (1) whether the court erred in refusing to give an entrapment instruction, (2) whether the felon-in- possession statute exceeds Congress's Commerce Clause authority, (3) whether the court properly relied on three convictions as predicates for application of an enhanced penalty under the Armed Career Criminal Act, and (4) whether the court erred in dismissing a challenge to the jury composition and selection procedures. Only the first issue merits extended discussion in this opinion. We discuss briefly our reasons for affirming the court's handling of the second and third issues, and we uphold the court's action on the jury challenge for the reasons set forth in an unpublished opinion issuing simultaneously with the present one, see United States v. Joost, No. 95-2031 (1st Cir. ___ _____________ _____ July x, 1996). After careful consideration, we conclude that the evidence merited a jury instruction on entrapment. We therefore reverse and remand for a new trial. Entrapment  __________ The Record. Whether an instruction on entrapment should __________ have been given here presents both a close and an unusual issue. While most entrapment cases focus on the question whether, assuming improper inducement, the defendant carried the burden of showing an unreadiness to commit the crime at issue, the ruling -2- here was the threshold one that there had been, as a matter of law, no showing of improper inducement. Moreover, the conduct of the law enforcement officers did not involve any single incident that could be said to be overbearing. And the defendant, while no stranger to criminal activities, was pursuing them in a field unrelated to dealing in firearms when this saga begins. This, therefore, is a case out of the ordinary. Since an entrapment instruction was refused, we must have before us all of the significant evidence that the jury heard. While we shall condense as much as we fairly can, we recognize that sometimes "the devil is in the details" and that too skeletal a summary risks overlooking something that could have persuaded a rational jury. Here is our effort. (1) The first month - a counterfeiting investigation. ______________________________________________________ Government efforts in this case occupied a period of four months, from March 23 to July 24, 1994. One Tracy had been caught passing counterfeit tokens at the Foxwoods Casino in Connecticut; he turned informant and volunteered to give information to Rhode Island authorities about the counterfeiting activities of his partner, defendant. Tracy introduced defendant to Rhode Island State Police detectives DelPrete and O'Donnell, who pretended to be petty thieves, one of them having a cousin strategically employed in the cashier's cage at the casino. Defendant had been convicted thirty years earlier of three breaking and entering felonies and had been imprisoned during most of the 1970's and 1980's. Since his release in 1987, he had -3- held jobs for only short periods. He had commenced his counterfeiting activity in February 1994. His only current legitimate source of income, and a poor one at that, was helping to fabricate costume jewelry components. His counterfeiting enterprise had suffered a setback when slot machines at the casino were altered so that they rejected the fraudulent tokens. When the detectives offered to pay fifty cents for each dollar token after they supposedly cashed in the tokens at the cashier's cage, defendant was delighted. Over the next four months he realized between $5,000 and $6,000 from this activity. (2) The Second Month - The Focus Changes. The detectives ______________________________________ began to extend their visits to defendant, in the words of DelPrete, "because he was bringing up other things for us to do." Defendant talked of many criminal ventures, some past, and others future possibilities. They included a vault robbery that defendant said he had helped plan while in prison, a warehouse- tractor/trailer job in Pennsylvania, and robberies of supermarkets, a novelty shop, a Ground Round restaurant, an armored car, a UPS truck, a VFW hall, and a night club ("Mustang Sally's"). The detectives said that they had broken into houses, and defendant spoke of being a safecracker in the 1960's and early 1970's. But, the detectives acknowledged, defendant represented that he himself did not do armed robberies. Defendant exhibited considerable criminal know-how as he critiqued various plans the -4- detectives brought forward and demonstrated how to use weapons in a robbery. Defendant testified that most of the stories he told were just stories, that they sprang from his imagination, his reading, or fiction he had written in prison, that he "talked tough" because he was dealing with "tough people" and wanted to sustain their interest in him because they were his only means to realize income from his counterfeiting. On April 24, a month after the first meeting, defendant, according to the detectives, introduced the subject of firearms in discussing the possibility of doing an armored car robbery, which might require them to shoot guards. According to defendant, the detectives had been introduced to him as "guys doing stick-ups," but he acknowledged that he was the first to talk about doing a specific robbery. He also mentioned the warehouse-tractor/trailer job possibility. During the month following this conversation, the detectives visited defendant on May 10 and May 13 and obtained counterfeit tokens. Defendant said there were from twenty to thirty phone calls during the entire four-month period. On May 20, defendant once again mentioned the use of firearms in connection with robbing an armored car facility. (3) The Third Month - Dialogue and Diversion. The third ___________________________________________ month of defendant's interactions with the detectives was characterized by a number of unavailing requests by the detectives that defendant procure a gun for use in Fall River, -5- attempted dissuasion on the part of defendant, and numerous trips to look over scenes of possible crimes. On May 27 the detectives told defendant that one of them had been harassed by a man in Fall River. They wanted defendant to find them a gun so that they could shoot out some windows in the assailant's house. Defendant responded that this was not a good idea; bullets could be traced to firearms. A better idea would be to burn or blow up the person's car. He also advocated use of a shotgun, which would be harder to trace, and said he had one "stashed." On June 2, O'Donnell reminded defendant of his need for a gun for the Fall River matter; defendant replied that he had seen one person, but that that person did not have a gun. On June 11, DelPrete, sporting a black eye from playing basketball, told defendant that the Fall River assailant had given it to him and again asked for a firearm. The request was repeated on June 16, defendant replying that he had unsuccessfully approached two people. Finally, on June 27, defendant was told that the Fall River project was off; DelPrete told defendant that he had gotten his revenge by smashing his adversary's car with a bat. Meanwhile, defendant and the detectives took a number of automobile trips. They drove to Pennsylvania to rob a tractor/trailer, defendant having brought along some burglar's tools. The operation was aborted when, as planned by the detectives, they were stopped but not arrested by police. On another occasion they followed a UPS truck but did not stop it. -6- On still another occasion. they drove to southern Rhode Island to look over a VFW hall that supposedly had a safe to be cracked. And on the night of June 29-30, they spent hours in the woods near the Meehan Armored Car facility. Defendant described the "pattern" that he said he followed in almost any conversation with the detectives: I would first tell them the story, flush [sic] out the details, then I would find perhaps some fault with it and say, "We would have to go up there and check it out." Ride, stall, talk, stall and then get them off on to something else. (4) The Fourth Month - Denouement. The record reveals no _______________________________ action or talk about firearms between the end of June and July 21. DelPrete testified that the detectives kept in contact with defendant, who was still producing counterfeit coins, and that he apparently had only limited resources and expected an imminent foreclosure on his house. On Thursday, July 21, the detectives visited defendant at his home, where he was soldering some costume jewelry. Defendant said he made three dollars an hour but that his supplier, to whom he owed money, was not going to pay him. O'Donnell interjected, "By Monday you could have - - we owe you, Bob. We really do." Then the detectives told defendant that their casino contact was quitting the following month, but that he would make one last exchange of money for 2500 counterfeit coins. The conversation then turned to the detectives' plans to rob a nightclub on Cape Cod, where they expected to get "12 grand -7- easy." Since they understood that the bartender carried a gun, they wanted defendant to obtain a firearm for them. Then followed lengthy discussion about the planning. Defendant asked when the detectives would accost the bartender and how they would make their getaway. He also suggested a trip to the nightclub. O'Donnell replied that this would delay the heist for two more weeks. They did not want to wait that long since they needed the money. Defendant then suggested making the trip the following night. O'Donnell said they would stay down on the Cape since the robbery would take place only a day or so after such a trip. They recognized that defendant had to return and decided to go without him. At this point, after some nine pages of transcribed taped conversation in which the detectives mentioned their need for a gun some six times, defendant said that he could probably obtain a "piece." They then discussed how to share the proceeds of the robbery. They asked what defendant thought was fair. Defendant said they did not have to give him anything, then said "I think I can get a 38, 38." O'Donnell said that they would give him "a piece of it" but if he came along he would get "33" [i.e., a third]. Defendant replied that he was so broke that he couldn't pay his bills and would take something. Once again, however, defendant suggested driving down to look at the nightclub. Once again the detectives refused, saying that the bartender was "ripe for the picking." After more speculation from defendant about what could go wrong, O'Donnell finally reaffirmed their intent to -8- do the job on Sunday. Defendant then said he could "get you a piece." O'Donnell wondered if defendant were "serious about it." Defendant at this point spoke without any qualification, "I'll get you a piece." All of the above discussion was recorded on tape. Defendant testified at trial that, on learning of the imminent departure of the casino contact, he "panicked" at the prospect of losing the only income he could get. He said that he wanted to delay so that he could "talk [the detectives] back into trying to talk this guy out of leaving the casino until we could do something else." He added, "I was afraid I was going to lose them and lose the opportunity to get some more money out of them." Defendant testified that the next day, Friday, July 22, he "ran into someone and mentioned to him that [he] was looking for a gun." The "person," who turned out to be informant Tracy, supplied defendant with a gun. On the same day the detectives called defendant, who said, "All set. No problem." The detectives called again on Saturday and defendant said he had the weapon. On Sunday, the day of the supposed robbery, the detectives went to defendant's house, where he handed them a 25- caliber Barretta, which he said he had borrowed, together with a clip and seven rounds of ammunition. Defendant was arrested and subsequently indicted and tried before a jury.  The Court's Rulings. At the end of the case, defendant ____________________ moved for an entrapment instruction. The court orally and -9- succinctly summarized the evidence, not failing to identify five occasions on which the government initiated discussion of firearms. It did not, however, make mention of any financial difficulty facing defendant or defendant's testimony as to his "pattern" or strategy in dealing with the detectives.  The gist of her ruling is as follows: Even if I were to take into account the cumulative effect of the four contacts between May 27th and June 16th and the fifth contact on July 21st, I do not believe that those conversations, those promptings, those fabrications as stated by the detectives, rise to the level of an improper inducement. That is not what the case law stands for. I think I cited [United States v.] Gendron[, 18 _____________ _______ F.3d 955, 960 (1st Cir. 1994),] wherein then Judge, now Justice Brier [sic] enumerates the types of things that the First Circuit considers to be improper Government inducement. I do not see the sort of urgency. I do not see the insistence. I do not see intimidation or threats, even taking all of those statements in the light most favorable to the defendant. In short, given the Defendant's criminal proclivities which were announced by him and admitted to by him as being in place even prior to the May 27th initiation by the detectives, of discussion of guns and given my finding that the Government's through the state troopers['] actions in this case do not amount to improper or undue influence, I do not believe that the evidence in this case shows anything more [than] that the Government created an opportunity for Mr. Joost to become criminally involved and to possess the weapon in question.1 The court made a second ruling in response to a jury request. The jury had left the courtroom at 2:40 p.m. At 3:10  ____________________ 1 In fairness, we must acknowledge the anomalous situation confronting the judge, who had previously presided over United ______ States v. Joost, No. 95-2031 (1st Cir. July xx, 1996), in which ______ _____ defendant consistently invoked the Fifth Amendment in refusing to answer questions about the statements that he was now saying were merely "stories." -10- it returned with a note saying, "Is entrapment a legal defense in this case? And if so, could you please define it?" This request, as the court acknowledged, was entirely understandable. Counsel for defendant had devoted his entire opening to picturing the defendant as concededly a felon who had knowingly possessed a firearm but who had been led into the crime by the blandishments of the detectives. He had concluded his remarks with the statement that he would ask for an instruction on entrapment. The court again refused to instruct on entrapment and simply notified the jury that that defense did not apply in this case. The jury finally reported its verdict at 4:30 p.m. In view of the stipulation and concessions of defendant, made in conjunction with his entrapment defense strategy, it is a matter of some wonder what the jury had to consider after receiving the court's ruling. Legal Discussion. The principles governing entitlement to ________________ an entrapment instruction are well known. The standard of review is plenary. United States v. Rodriguez, 858 F.2d 809, 812 (1st _____________ _________ Cir. 1988). The policy behind the entrapment defense seeks to deter the government from such zeal in pursuing a conviction that its efforts result in the commission of a crime that likely would not have occurred if the suspect had been left to his own devices. Jacobson v. United States, 503 U.S. 540, 553-54 (1992). ________ _____________ The principle protects both citizens who are completely law abiding and those who have violated laws but whose unreadiness to commit a particular type of crime was overcome by excessive -11- governmental efforts. The question is whether the government "induced the defendant to perform a criminal act that he was not predisposed to commit." Rodriguez, 858 F.2d at 814. _________ There are two elements to the entrapment defense: improper government inducement to commit the offense and a lack of predisposition on the part of defendant to commit such an offense. United States v. Gendron, 18 F.3d 955, 960 (1st Cir. _____________ _______ 1994). In order to be entitled to an entrapment instruction, the defendant has the burden of producing "some evidence" on both elements "sufficient to raise a reasonable doubt as to whether he `was an "unwary innocent" rather than an "unwary criminal."'" United States v. Hernandez, 995 F.2d 307, 313 (1st Cir. 1993) _____________ _________ (citations omitted).  A court assessing the sufficiency of a defendant's showing must be able to find more than a scintilla of evidence, more than mere creation of an opportunity for criminal activity. See United ___ ______ States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987). A "sting" ______ _____ operation is not improper inducement if it merely provides an opportunity to commit a crime, but proof of opportunity plus "something else" may be adequate to meet a defendant's burden. Examples found sufficient by courts include threats, forceful solicitation and dogged insistence, playing upon sympathies or the past relationship of a war buddy, and repeated suggestions at a time when defendant had lost his job and needed money. Gendron, 18 F.3d at 961.  _______ -12- Moreover, while conclusory and self-serving statements by a defendant are not sufficient, Rodriguez, 858 F.2d at 813, a _________ defendant's account, though self serving, may have weight if it "is interlaced with considerable detail and has some circumstantial corroboration in the record." Id. at 815. __ Indeed, as we stated in Rodriguez, "[W]e recognize that _________ Rodriguez's soliloquy was self-serving -- but realistically, how better than through his own testimony can a defendant meet his entry-level burden?" Id. __ In applying the above principles to this case, we emphasize that we are not considering the sufficiency of a verdict for the government on this record, if an entrapment instruction had been given, but the closer question whether a rational jury could have found entrapment if allowed to consider that defense. We first review the most relevant precedents in this circuit. In Rodriguez, 858 F.2d at 811, 815-16, a government agent _________ had designed a lucrative drug deal, made the initial approach to defendant, and solicited forcefully with "dogged insistence," making four calls in one day. The defendant had testified in what the court characterized as a self-serving soliloquy, but one in considerable detail and with some corroboration. We held it error for the district court to have refused to give an entrapment charge. A year later, in United States v. Campbell, ______________ ________ 874 F.2d 838, 845 (1st Cir. 1989), where the government had set up a drug deal through an informant who had been befriended by defendant, we upheld the language of the entrapment charge and -13- rejected the government's suggestion that the charge need not have been given. In Gendron, 18 F.3d at 961, then Chief Judge Breyer listed _______ the various examples of improper inducement we have mentioned above, including a reference to Rodriguez's "dogged insistence," _________ and also noted United States v. Kessee, 992 F.2d 1001, 1003 (9th _______________________ Cir. 1993). In Kessee, defendant, after initially refusing an ______ informant's request to enter an illegal drug deal, yielded to further requests after he lost two jobs and needed money for food and rent. Defendant had initiated several calls and had proposed selling drugs to the informant, and had claimed to have engaged in over fifty drug deals. He testified that he lied to obtain a sentence reduction for cooperation, that he carried a gun because of fear, and that he had tried to impress the informant. The court reversed the trial court, holding that an entrapment instruction should have been given, because only the jury should have assessed the truth of defendant's testimony. Id. at 1003-4. __ Most recently, in United States v. Acosta, 67 F.3d 334, 338 _____________ ______ (1st Cir. 1995), an informant, seeking to obtain a firearm from defendant, engaged in "a campaign of persistent calls . . . before [defendant] responded, apparently several weeks later." There were no threats, appeals to sympathy, relentless trickery, or extravagant rewards. While we held the evidence withstood a challenge to sufficiency, we observed that the facts occupied the "middle ground between what is plainly proper and what is plainly -14- improper." We said that if the issue had not been submitted to the jury, we would have reversed.  In the light of these precedents, we now consider some of the evidence favorable to an entrapment defense. First, there is the extended period of time, three months, before the defendant produced a firearm, the latter two months consisting of active solicitation by the detectives following their requests for a weapon. A jury might have believed that what began as an investigation of counterfeiting was transformed into an effort at entrapment once the detectives perceived that possibility. When defendant failed to take the bait the first time, they repeated their effort with even more urgency.  Second, the jury could have found that the detectives, with full knowledge of the dire financial straits in which defendant found himself, deliberately created a dependency relationship in their continuing practice of paying substantial sums for his counterfeit tokens. The lure of continuing payment could be looked on as more than the "`greed or . . . lure of easy money'" found unpersuasive as evidence of entrapment in United States v. _____________ Panet-Collazo, 960 F.2d 256, 259 (1st Cir. 1992) (citing Coady, _____________ _____ 809 F.2d at 121). A third factor that the jury could consider as evidence of "urgency" and "insistence," contrary to the district court's reaction, is the number, frequency, and immediacy of the detectives' contacts, involving both personal visits and phone calls. A fourth factor, which might well have been considered -15- the "plus" added to "opportunity," was the detectives' renewal, in a context of urgency (the insistence on robbing the nightclub on Cape Cod within several days' time), of their request for a firearm, conjoined with the jolting news of the imminent departure of their casino contact source of funds. In denying the request for an entrapment charge, the district court made no mention of defendant's financial stringency or the arguable impact of the news of this formidable threat to continued income. A fifth factor entering our assessment is defendant's testimony about his motive, strategy, and "pattern" of "stall, talk, ride, and change the subject." The district court included defendant's "discussion of guns" in her reasons for finding no basis for a rational conclusion of improper inducement. But defendant's story of inventing escapades, finding holes in them, suggesting exploratory trips, and inventing excuses for not producing a gun is both detailed and corroborated by the evidence. It may well be that a jury would dismiss all of this as a pack of lies, but it seems to us that this was a task for the jury, not the judge. We therefore conclude that enough evidence of inducement was introduced to meet defendant's burden on this first prong of the entrapment defense. As for the absence of predisposition prong, much of what we have pointed to is relevant. We must acknowledge that defendant was certainly predisposed to commit the crime of counterfeiting, but the question is whether he was predisposed to commit the crime of procuring and possessing a firearm before the ______ -16- government intervened. See Jacobson, 503 U.S. at 549. The span ___ ________ of time that elapsed before a gun was produced, the excuses, delays, and defendant's explanation of his strategy persuade us that defendant met his burden on this prong as well. He therefore must be retried.  -17- Remaining Issues ________________ Constitutionality. Defendant challenges the district _________________ court's denial of his pretrial motion to dismiss the indictment on the ground that 18 U.S.C. 922(g) exceeded Congress's Commerce Clause authority under the reasoning of United States v. _____________ Lopez, 115 S. Ct. 1624 (1995). This issue is no longer open in _____ this circuit. See United States v. Abernathy, 83 F.3d 17, 20 ___ ______________ _________ (1st Cir. 1996); United States v. Bennett, 75 F.3d 40, 49 (1st ______________ _______ Cir. 1996). The district court ruled correctly. Validity of predicate convictions. Defendant challenges the _________________________________ court's imposition of an enhanced thirty-year sentence under the authority of 18 U.S.C. 924(e), claiming error in its holding valid three 1964 Rhode Island convictions for breaking and entering. Although discussion of sentencing at this time is unnecessary in light of our conclusion that defendant's conviction must be vacated, we briefly respond.  Defendant offered his own signed, but unsworn, statement that he did not have counsel when he entered nolo contendere pleas on the three state convictions. The government, however, introduced docket cards maintained by the Attorney General, each indicating, following the printed word "Counsel," the name of Leo McGowan, now deceased, then a part-time public defender. Police records also showed representation by McGowan in the complaints and warrants. In addition, the face sheets accompanying the convictions bore, in pencil, the name "Bevilacqua," then a prominent criminal defense lawyer. -18- The district court found nothing in the records to hint of invalidity and viewed defendant's statement to be completely incredible. The court noted, as well, that the convictions had been entered more than a year after Gideon v. Wainwright, 372 ______ __________ U.S. 335 (1963), had required counsel in felony cases and that Rhode Island had, for more than twenty years before the convictions, followed the practice of appointing counsel in such cases. We detect no error in the court's ruling that defendant failed to produce sufficient credible evidence to rebut the presumption of constitutional validity that arose from introduction of certified copies of the convictions. See United ___ ______ States v. Tracy, 36 F.3d 187, 197 (1st Cir. 1994). ______ _____ For reasons stated, the judgment is reversed and the case is ____________________________________________________________ remanded for a new trial. _________________________ -19-