USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 95-1955 UNITED STATES, Appellee, v. ALEJANDRO VEGA, Defendant - Appellant. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Richard G. Stearns, U.S. District Judge] ___________________ ____________________ Before Boudin, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Skinner,* Senior District Judge. _____________________ _____________________ Daniel T.S. Heffernan, by appointment of the Court, with ______________________ whom Sugarman, Rogers, Barshak & Cohen, P.C. was on brief for _________________________________________ appellant. Kevin P. McGrath, Assistant United States Attorney, with _________________ whom Donald K. Stern, United States Attorney, was on brief for _______________ appellee. ____________________ December 19, 1996 ____________________  ____________________ * Of the District of Massachusetts, sitting by designation. SKINNER, Senior District Judge. Alejandro Vega was SKINNER, Senior District Judge. ______________________ charged in an eight-count indictment for conspiracy to distribute and distribution of cocaine base in violation of 21 U.S.C.  841, 846 and unlicensed dealing in firearms in violation of 18 U.S.C. 922(a)(1)(A). After the jury returned a guilty verdict on five of the six counts against Vega, he was sentenced to thirty years incarceration. On appeal, Vega argues that the district court erred in refusing to instruct the jury on the defense of entrapment. We affirm. Our review is plenary and, where the issue is entitlement to a jury instruction on a proposed defense, we take the evidence in the light most favorable to the defendant. United States v. Young, 78 F.3d 758, 760 (1st Cir. 1996). This ______________ _____ prosecution arose out of an undercover investigation conducted by federal agents in the Bureau of Alcohol, Tobacco and Firearms ("ATF") and the Drug Enforcement Agency ("DEA"). In the spring of 1994, a confidential informant working for the ATF, Jos  Troche, had purchased a semi-automatic handgun and ammunition from Ceferino Cruz, one of Vega's co-conspirators. On July 12, 1994, Troche made arrangements with Cruz to purchase some "crack" cocaine. Later that day, Troche met Cruz at La Tambora restaurant in Lawrence, Massachusetts. Troche was accompanied by DEA Special Agent Pamela Mersky whom Troche presented as his girlfriend. Troche and Mersky purchased one ounce of crack and a .38 caliber handgun from Cruz. Troche told Cruz that, in the -2- future, Mersky would appear on Troche's behalf when he was unable to come. On July 28, 1994, Agent Mersky returned to La Tambora in order to make an additional narcotics and firearm purchase from Cruz. When she arrived, Cruz was occupied in conversation. Mersky approached and greeted Cruz and then waited a few feet away from him as he completed his conversation. While Mersky was waiting, Vega approached her and asked her what she wanted. Mersky indicated that she was interested in buying crack cocaine. Vega responded initially with apparent bewilderment, but when Mersky said that Cruz had supplied her before, Vega approached Cruz and had a brief conversation with him. After a moment, Vega returned and again asked Mersky what she wanted. She replied that she wanted the same thing as the last time. Vega again discussed the request with Cruz and told Mersky that she should return in about an hour. When Mersky returned to La Tambora, she and Vega sat down at one of the tables. A young female, who turned out to be Cruz's fifteen-year-old girlfriend, approached them and removed from her clothing a small plastic bag containing 32.1 grams of crack cocaine. The three then completed the sale in the women's restroom, where Mersky observed what she believed to be a handgun in Vega's waistband. (The object was in fact a knife with a five-inch black handle and an eight-inch blade.) She said to Vega that she was interested in buying a handgun like the one he appeared to have. Vega replied that Cruz did not know about her -3- interest in a handgun, but Vega would check with Cruz about obtaining a gun for sale. Mersky gave Vega her electronic pager number and left the restaurant. Later that afternoon, Vega paged Mersky and informed her that he had a gun for her. The two arranged to meet at another restaurant near La Tambora. When Vega detected the presence of two undercover DEA surveillance agents at the meeting place, he and Mersky went to La Tambora to complete the sale of a .38 caliber handgun. When Mersky started to leave, Vega offered to accompany her. She refused. He then invited her to a dance later that week. Again, however, Mersky refused. She indicated she had a boyfriend and left the restaurant. Undeterred, Vega paged Mersky again on the same day. Mersky indicated her dissatisfaction that the gun was not new as Vega had represented. He offered her a better price on the next gun and Mersky suggested a better price for the cocaine as well. When Vega equivocated, Mersky suggested that she might take her business elsewhere. Vega responded that he only wanted Mersky to love him or like him. Mersky laughed and said she could not love him because she had a boyfriend.  On August 1, 1994, Vega again paged Mersky to see whether she needed anything. The two arranged to meet the following day at a restaurant near La Tambora. Vega and Mersky met and walked to La Tambora. She asked about getting some cocaine. Vega sold Mersky an additional 30.6 grams of crack cocaine. Mersky also requested a gun, but Vega said he needed -4- additional time. He paged her again later that day when he had the gun, but Mersky did not want to meet until the following day. On August 3, 1994, Vega and Mersky met again at La Tambora and completed the sale of another firearm and additional ammunition. On August 4, 1994, Vega paged Mersky several times to see whether Mersky needed anything more. She replied that she would not need anything until the end of the week. Vega continued to page her for the next few days, but Mersky did not respond. On August 8, 1994, Mersky finally returned another page from Vega and again indicated that she did not need anything at that time. Vega said that he had been worried about her and that, for any business in the future, he would receive 3.5 grams of cocaine as a commission. On August 15, 1994, Vega paged Mersky to tell her that he had two handguns (.44 caliber and .38 caliber) for sale. Mersky asked about more cocaine and Vega said he could supply her. She told him she would call the next day. On August 16, 1994, Vega met Mersky at a restaurant near La Tambora. They walked to La Tambora and Mersky purchased the .38 caliber handgun. She and Vega then waited for the cocaine supplier to arrive, whereupon Mersky purchased 30.5 grams of cocaine from Vega. On August 23, 1994, Mersky met Vega in the parking lot of La Tambora. They drove to Vega's apartment where he retrieved a .44 caliber gun which he sold to Mersky. Later that day, Vega sold Mersky 61.3 grams of cocaine. -5- Vega and his cohorts were arrested three days later. At trial, the district judge indicated at the conclusion of Mersky's direct testimony that he did not anticipate the need to instruct the jury on entrapment. During the charge conference, the district judge discussed with counsel this circuit's well established position on the entrapment defense and concluded that "there just simply is insufficient evidence of entrapment." (Tr. at 5-99.) Accordingly, the district court did not instruct the jury on the defense of entrapment. During deliberation, the jury presented a question to the district court in which it asked whether entrapment was a reasonable defense and, if so, whether the jury could get clarification. (Id. at 6-2.) After consultation with counsel ___ for both sides, the district judge informed the jury that he deliberately had omitted an instruction on entrapment because the defense did not apply. The jury subsequently returned a guilty verdict on five of the six charges against Vega. Vega contends that the district court erred in failing to instruct the jury on the defense of entrapment. In particular, he argues that (1) Mersky induced Vega to commit the crimes charged by playing on his alleged romantic interest in her and (2) there was ample evidence to establish Vega's lack of predisposition to commit the crimes. The record does not support either of Vega's contentions. -6- Our position on the defense of entrapment is well settled:  Entrapment does not blossom whenever a person succumbs to his own greed or to the lure of easy money: it blooms only when the crime for which the miscreant is subsequently charged was instigated by minions of the law and the offender had ___ no previous disposition towards commission of the deed.  United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987) (citing _____________ _____ United States v. Fera, 616 F.2d 590, 596 (1st Cir.), cert. ______________ ____ _____ denied, 446 U.S. 969, 100 S. Ct. 2951, 64 L.Ed.2d 830 (1980)). ______ In other words, "a defendant is entitled to a jury instruction on entrapment if there is record evidence which fairly supports the claims of both government inducement of the crime and defendant's lack of predisposition to engage in it." United States v. ______________ Rodr guez, 858 F.2d 809, 814 (1st Cir. 1988). Although "[s]uch _________ proof may, of course, be circumstantial rather than direct," id., ___ we have made it clear that "[w]hen all is said and done . . . there must be some hard evidence in the record which, if believed by a rational juror, would suffice to create a reasonable doubt as to whether government actors induced the defendant to perform a criminal act that he was not predisposed to commit." Id.  ___ We emphasize that the defense will not be available unless both elements of (1) government inducement and (2) defendant's lack of criminal predisposition exist. See id. ___ ___ Where either element is absent, the defense will be inapplicable. Id. at 814-15. Accordingly, where there exists insufficient ___ evidence to establish government inducement, the court need not -7- reach consideration of the evidence on the accused's criminal predisposition, and vice versa. Young, 78 F.3d at 762 & n.3. _____ Determining whether the appropriate quantum of evidence exists is "a matter of law for the court." Rodr guez, 858 F.2d at 814.  _________ We have recently had the opportunity to examine relevant cases from the Supreme Court and several circuits on the defense of entrapment, which we summarized as follows: In describing "inducement," courts have distinguished between proper and improper law enforcement activities. It is proper (i.e., not an "inducement") for the government to use a "sting," at least where it amounts to providing a defendant with an "opportunity" to commit a crime. Without this kind of law enforcement weapon, it would often prove difficult, or impossible, to stop certain seriously criminal activity, particularly activity involving drugs, or corruption, or other crimes in which no direct participant wants the crime detected. An improper "inducement," however, goes beyond providing an ordinary "opportunity to commit a crime." An "inducement" consists of an "opportunity" plus something else -- typically, ____ excessive pressure by the government upon the defendant or the government's taking advantage of an alternative, non-criminal type of motive. A "sting" that combines an ordinary opportunity with these extra elements runs the risk of catching in the law enforcement net not only those who might well have committed the crime elsewhere (in the absence of the sting), but also those who (in its absence) likely would never have done so. Insofar as the net catches the latter, it stretches beyond its basic law enforcement purpose. Some examples of improper "inducement" may help. Courts have found a basis for sending the entrapment issue -8- to the jury (or finding entrapment established as a matter of law) where government officials: (1) used "intimidation" and "threats" against a defendant's family, (2) called every day, "began threatening" the defendant, and were belligerent, (3) engaged in "forceful" solicitation and "dogged insistence until [defendant] capitulated," (4) played upon defendant's sympathy for informant's common narcotics experience and withdrawal symptoms, (5) played upon sentiment of "one former war buddy . . . for another" to get liquor (during prohibition), (6) used "repeated suggestions" which succeeded only when defendant had lost his job and needed money for his family's food and rent, [and] (7) told defendant that she (the agent) was suicidal and in desperate need of money. . . . United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994) _____________ _______ (citations omitted). With these examples in mind, we turn to a consideration of the appeal now before us. Vega asserts that Mersky played on his romantic interest in her to induce him to commit the crimes with which he was charged. In particular, he points to three particular pieces of evidence to establish his purported romantic interest: (1) on July 28, 1994, the initial date of contact, Vega invited Mersky to a dance; (2) on the same date, Vega stated that he wanted Mersky to love him; and (3) on August 2, 1994, Mersky embarrassed Vega when he invited her to lunch, apparently for the purposes of conducting additional firearms and narcotics sales, and she replied that he did not have any money to pay for lunch. Examining each of the instances raised by Vega, we conclude that the record does not support his position. At the outset, we note -9- that none of the circumstances enumerated in our decision in Gendron is present here. Moreover, the scant evidence on which _______ Vega attempts to rely is unpersuasive.  In response to the July 28, 1994 dance invitation, Mersky replied that she had a boyfriend and could not attend the dance with Vega. Later the same day, when an insistent Vega incongruously1 stated that he wanted Mersky to love him, Mersky  ____________________ 1 The transcripts of Mersky's tape recordings of her conversations with Vega suggest that he spoke English with some difficulty and that he only meant that he wanted Mersky to "like" him so as to continue doing business with him. Their exchange regarding whether the first handgun sold was new as Vega had represented is as follows: MERSKY: I forgive you this time, but if you take advantage next time, I'm never gonna see you again. VEGA: It was not my intention, I didn't did it, I didn't did it, because I wanna take advantage, or anything, the same way I gave it to you wrapped up in the paper bag, the same way I gave it to you, the same way I got it, and I no even take it up a no see it, nothing like that. MERSKY: Okay. VEGA: Alright. MERSKY: I like you, but don't make me hate you. VEGA: Alright. MERSKY: Okay? VEGA: No, I just want you to love me, like me, just like you like me the first time. -10- laughed and repeated that she already had a boyfriend. Twice Vega attempted to engage Mersky's affections and twice he was rebuffed. Far from supporting Vega's contention that Mersky played on his alleged romantic interest, the evidence demonstrates that she attempted to quash his unsolicited affection. As for the allegedly embarrassing lunch incident on August 2, 1994, a review of the record makes it difficult to determine how Mersky's accusation, standing alone as it is alleged, that Vega had no money to pay for lunch could be viewed as an inducement to criminal activity. Even if Vega's version of the events were credible, the evidence viewed from his perspective would demonstrate, at best, only that Mersky induced him to profit from the illegal transactions, not that she induced him to commit the illicit activity. As counsel for the government has noted, Vega cannot successfully portray himself, as he has attempted, as a lonely  ____________________ MERSKY: I can't love you, I already have a boyfriend . . . (Laughs). VEGA: Oh, then like me, then like me, right, then like me. MERSKY: Okay, I like you a lot, you're very nice. VEGA: Thank you. MERSKY: Okay. (Ex. 8A at 5.) -11- man eager to connect with the first unaccompanied female to enter La Tambora. Vega himself informed Mersky that as of August 23, 1994 he had been living with his girlfriend. It should also be noted that the instances which Vega presents as events of inducement each occurred after the completion of his initial narcotics and firearm sale to Mersky. These episodes cannot, as a logical proposition, constitute inducement for the initial illegal sale. With respect to the remaining counts of which Vega was convicted, the undisputed evidence amply demonstrates that Vega initiated contact with Mersky about each of the subsequent narcotics or firearms sales. In fact, he attempted to initiate numerous additional sales but Mersky refused.  Finally, Vega relies on two of this court's decisions to bolster his appeal. First, Vega cites Kadis v. United States, _____ _____________ 373 F.2d 370 (1st Cir. 1967), to support his position that Mersky's conduct during Vega's initial encounter with her on July 28, 1994 constituted inducement. In Kadis, we held that the _____ district court properly submitted the evidence and instructed the jury regarding entrapment in a case where government agents obtained refills of prescriptions which did not authorize refills. Id. at 374-75. We accordingly affirmed the lower ___ court's decision. The facts underlying our decision in Kadis are _____ inapposite to our disposition here. The evidence in this case reveals that Vega approached Mersky in La Tambora and asked her what she wanted. Although he expressed some bewilderment -12- initially, after a few moments, he had conferred with his co- conspirator and was prepared to supply Mersky with narcotics within an hour. We reiterate what we stated in Kadis. "Evidence _____ that the defendant resisted the criminal suggestion raises the question whether his hesitation exhibited the conscience of the upright, or merely the circumspection of the criminal." Kadis, _____ 373 F.2d at 374. A review of the record reveals a clear demonstration of the latter. Mersky did not plant the seed of criminality in Vega's mind; rather she merely represented herself as a bona fide willing buyer. Second, Vega relies on our recent decision in United ______ States v. Joost, 92 F.3d 7 (1st Cir. 1996), as a factually ______ _____ analogous precedent supporting his position in this appeal. While Joost presented us with an "unusual issue" which also _____ confronts us here -- to wit, whether as a threshold issue "there had been, as a matter of law, no showing of improper inducement," id. at 8 -- the facts in the instant appeal clearly warrant a ___ different result. Joost involved an undercover operation by two _____ Rhode Island State Police detectives who assisted Joost in converting counterfeit casino tokens into cash. During the course of their relationship with Joost, the detectives presented various schemes which tested Joost's criminal knowledge and explored his illicit proclivities. In particular, we noted that the final criminal plan was presented by the detectives to Joost. They devised a scheme to rob a nightclub in Massachusetts and initiated discussions about Joost's obtaining a firearm for the -13- job. We noted then that the detectives mentioned the firearm several times and Joost only provided the weapon after a significant period of time. Given Joost's practice of "inventing escapades, finding holes in them, suggesting exploratory trips, and inventing excuses for not producing a gun," id. at 13, we ___ held that Joost had produced sufficient evidence of inducement to merit a jury instruction on entrapment. We accordingly reversed the conviction and remanded the case for a new trial. The facts underlying our decision in Joost differ _____ significantly from those presented by this appeal. In this case, Vega has presented no evidence of a practice similar to Joost's of making delays or creating obstacles to execution of criminal transactions proposed by government agents. To the contrary, the undisputed evidence demonstrates that Vega responded to Mersky's initial request for narcotics and firearms within an hour and that, for each subsequent transaction, Vega contacted Mersky, thus initiating the illegal conduct himself. Given this evidence, our decision in Joost is no help to this defendant. _____ As previously indicated, because we find that Vega has not presented any "hard" evidence of government inducement, we need not reach the question of his alleged lack of criminal predisposition. It should suffice to recall the Supreme Court's guidance in Jacobson v. United States, 503 U.S. 540 (1992), that ________ _____________ in the "typical case or in a more elaborate 'sting' operation involving government-sponsored fencing where the defendant is simply provided with the opportunity to commit a crime, the -14- entrapment defense is of little use because the ready commission _____________________ of the criminal act amply demonstrates the defendant's _________________________________________________________________ predisposition." Id. at 549-50 (emphasis supplied). In this ______________ ___ appeal, we note, nevertheless, that Vega's conduct on July 28, 1994 when he supplied Mersky with narcotics within one hour of their first encounter is as "ready commission of the criminal act" as the Jacobson Court might have imagined and his subsequent ________ conduct "amply demonstrates" his predisposition. For the foregoing reasons, the judgment of the district court is affirmed. affirmed -15-