# United States Court of Appeals
## For the First Circuit

No. 06-1751

UNITED STATES OF AMERICA,

Appellee,

v.

IVAN TELEGUZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Boudin, Chief Judge,

Lynch and Lipez, Circuit Judges.

William S. Smith for appellant.
Kevin O'Regan, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, was on brief, for
appellee.

July 24, 2007

**LYNCH**, **Circuit Judge**.  Ivan Teleguez of Lancaster, Pennsylvania, participated in an interstate business, the selling of firearms.  He sold firearms to Carlos Ortiz, a cooperating witness for the FBI in Springfield, Massachusetts.  All told, over a fifteen-month period ending in October 2002, Teleguez and his co-defendants sold to Ortiz twenty-five firearms, thirteen of which had obliterated serial numbers.

Teleguez was charged with federal conspiracies both to deal firearms without a license, see 18 U.S.C. §§ 371, 922(a)(1)(A), and to possess firearms with obliterated serial numbers, see id. §§ 371, 922(k), as well as three separate counts of possession of firearms with obliterated serial numbers, see id. § 922(k).  His co-defendants, Aleksei Safanov, Roman Zhirnov, Andrey Buynovskiy, and Michael Quickel, all pled guilty, and Quickel testified against Teleguez.  A jury convicted Teleguez on all counts.  The district court sentenced Teleguez to fifty-one months' imprisonment, to be followed by three years of supervised release, and a special monetary assessment of $500.

Teleguez attacks his conviction, arguing that the district court erred (1) in denying his request for an entrapment instruction and in precluding him from arguing entrapment at closing, (2) in denying his motion to dismiss the possession counts on interstate commerce grounds, (3) in denying his motions to suppress his post-arrest statement, and (4) in denying a motion for

judgment of acquittal as a matter of law as to the possession counts. We affirm. We adhere to our prior rule that 18 U.S.C. § 922(k) is a constitutional exercise of Congress's Commerce Clause powers, see United States v. Diaz-Martinez, 71 F.3d 946, 953 (1st Cir. 1995), and hold that this result is not overruled by Jones v. United States, 529 U.S. 848 (2000), or United States v. Morrison, 529 U.S. 598 (2000).

## I.  FACTS

A.        Ortiz's Firearms Purchases

Ortiz was paid by the FBI to assist in criminal investigations. In this case, Ortiz received approximately $80,000.

In the early summer of 2001, FBI Special Agent Robert Lewis asked Ortiz to "keep an eye out and an ear out for criminal activity amongst Russian individuals in the Springfield area." Ortiz's inquiries of some members of the Russian community ultimately led to the criminal firearms transactions charges in this case. At various times, Ortiz represented that he had his own customers for guns.

The first firearms transaction occurred in July 2001. Ortiz went to a local gun store, where he was approached by Buynovskiy. Buynovskiy asked Ortiz if he was interested in purchasing some rifles. Ortiz was interested; he consulted the FBI and then gave Buynovskiy a $200 deposit. On July 2, Buynovskiy and

Zhirnov met with Ortiz in a parking lot, where Ortiz purchased two rifles and ammunition for $1,800. The source of at least one of these weapons was Teleguez. More than a year earlier, in the spring of 2000, Teleguez had purchased one of these rifles from an acquaintance in Pennsylvania.

The FBI investigation was interrupted by the events of September 11, 2001, but then resumed in the spring of 2002. On April 6, 2002, Ortiz purchased two firearms from Buynovskiy and Safanov. He purchased an additional firearm from Safanov on May 20, 2002.

On June 24, 2002, Ortiz and Safanov, at Safanov's suggestion, drove together to Pennsylvania to buy guns from Teleguez. The two went to Teleguez's house in Ephrata, Pennsylvania, where Ortiz purchased four firearms. The serial number on one of the four firearms had been obliterated by grinding. The two returned to Massachusetts with the firearms.

On July 16, 2002, Ortiz went to Safanov's apartment in Springfield and purchased another five firearms. Serial numbers on three of these firearms had been removed.

On August 25, 2002, Teleguez, who had traveled to Massachusetts, met Ortiz in a Springfield parking lot and sold Ortiz another eight firearms, six of which had their serial numbers obliterated. Teleguez asked Ortiz to send him money for the firearms by mail. The defendant gave Ortiz an envelope with his

name and Pennsylvania address written on it. On August 27, 2002, Ortiz instead sent Teleguez a wire transfer for $1,500 as additional payment for the firearms purchased two days earlier.

On August 30, 2002, Teleguez again met with Ortiz in Springfield. This time, defendant sold Ortiz two semi-automatic pistols with obliterated serial numbers. Ortiz paid Teleguez $1,200.

On October 3, 2002, at Teleguez's direction, Ortiz met with Zhirnov in Springfield. Zhirnov sold Ortiz a firearm whose serial number had been removed. The next day, Ortiz wired $850 to Teleguez in payment for the firearm.

B.     Quickel's Firearms Purchases for Teleguez

Quickel testified that in July and August 2002, he purchased firearms for Teleguez, at defendant's request. Quickel used his own identification at legitimate firearms stores in Pennsylvania. Teleguez had told him that Teleguez could not purchase the firearms in his own name. Typically, Teleguez went with Quickel to the firearms stores, told Quickel which firearms to buy, and gave Quickel money to purchase the firearms. Quickel would carry the firearms out of the store himself, and then hand them over to Teleguez. The defendant paid Quickel $100 for each rifle and $200 for each pistol purchased.

The government introduced into evidence six transaction records detailing Quickel's firearms purchases in Pennsylvania on

behalf of Teleguez. The records showed that Quickel purchased fifteen firearms from July 8 through August 28, 2002. All of the firearms had serial numbers at the time of purchase.

ATF Special Agent Patrick Burns testified about the guns Quickel purchased for Teleguez which were ultimately sold to Ortiz. Burns testified that Ortiz purchased nine firearms that were similar to firearms Quickel purchased for Teleguez. All nine of the firearms had obliterated serial numbers when they were sold to Ortiz. As to four of the firearms, the similarity to Quickel's purchases was limited to the manufacturer and type of firearm. As to the remaining five firearms, the government was able to raise partial serial numbers which matched the serial numbers associated with the firearms purchased by Quickel.

## II. ANALYSIS

A.      Denial of Request for Entrapment Instruction and Preclusion from Arguing Entrapment at Closing

Teleguez's primary argument is that he was entitled to an entrapment instruction because the evidence shows that Ortiz was an insistent buyer who was doggedly persistent, and this amounted to improper inducement of Teleguez. Teleguez also argues that the district court erred in precluding him from arguing entrapment to the jury at closing. Teleguez preserved his objections at trial; we review the denial of the entrapment instruction de novo, United States v. Sánchez-Berríos, 424 F.3d 65, 76 (1st Cir. 2005), and review the limitations placed on defendant's closing argument for

abuse of discretion, United States v. Wood, 982 F.2d 1, 4 (1st Cir. 1992).

The entrapment defense is not a doctrine of constitutional dimension or one expressly created by statute. United States v. Russell, 411 U.S. 423, 432-33 (1973); see also United States v. Luisi, 482 F.3d 43, 52 (1st Cir. 2007). Rather, it is a judicially created doctrine which recognizes that "Congress could not have intended that its statutes were to be enforced by tempting innocent persons into violations." Sherman v. United States, 356 U.S. 369, 372 (1958).

The question is whether a reasonable jury could view the evidence as establishing that defendant was entrapped. See United States v. Rodriguez, 858 F.2d 809, 812 (1st Cir. 1988). If so, Teleguez was entitled to an entrapment instruction; if not, there was no error in the district court's denial of defendant's request.

The entrapment defense consists of two prongs. Luisi, 482 F.3d at 52. The first prong requires a showing of improper government inducement. United States v. Gamache, 156 F.3d 1, 9 (1st Cir. 1998). The second prong requires that the defendant have had a lack of predisposition to commit the offense. Id. Because entrapment is a judicially created doctrine, courts have been careful not to contravene congressional intent to punish those who commit the offense; that, in turn, requires that the doctrine take

into account the practical problems faced by federal law enforcement. See Luisi, 482 F.3d at 52-53.

Our case law stating that a defendant has a low entry-level burden for obtaining an entrapment instruction, Gamache, 156 F.3d at 9, should not be misunderstood (as defendant here misunderstands). In assessing whether the entry-level burden for an instruction has been met, we look at the evidence most charitably to the defendant and determine whether it is sufficient for a reasonable jury to conclude that there was entrapment. See Rodriquez, 858 F.2d at 813.

In this case, no reasonable jury could conclude that there was any improper government inducement. Defendant's argument is based on an erroneous understanding of (1) what it takes to show improper inducement, (2) the personal nature of the entrapment defense, and (3) the scope of the record to be considered.

Acceptance of Teleguez's arguments would so water down the concept of improper inducement as to delete the requirement of impropriety from the equation. Admittedly, sometimes a judgment on what is sufficient to make a plausible claim of improper inducement can be a close call. Nonetheless, merely giving a defendant an opportunity to commit a crime when the government puts forth an enthusiastic and persistent buyer of illicit goods cannot be improper inducement.

Decisions which discuss the improper inducement requirement often use the phrase that there must be "opportunity plus," and then turn to the nature of the "plus." See, e.g., United States v. Capelton, 350 F.3d 231, 243 (1st Cir. 2003); United States v. Vega, 102 F.3d 1301, 1305 (1st Cir. 1996). Plucking phrases from the case law, Teleguez argues that the "plus" factor is necessarily satisfied by evidence of government manipulation or by forceful solicitation and dogged insistence. He cites United States v. Gendron, 18 F.3d 955 (1st Cir. 1994), for support. Gendron, however, is clear that sting operations ordinarily do not involve improper inducement. See id. at 961; see also Gamache, 156 F.3d at 9 ("A 'sting' operation is not improper inducement if it merely provides an opportunity to commit a crime . . . ."). Indeed, sting operations by their nature often involve government manipulation, solicitation, and, at times, deceit. See, e.g., Sánchez-Berríos, 424 F.3d at 71-72, 76-77.

Teleguez's argument that the evidence supported an entrapment instruction rests on evidence to the following effect. Teleguez argues that it was the government agent[1] Ortiz who first approached Teleguez and the co-defendants about purchasing firearms. Teleguez also maintains that Ortiz was not simply a buyer; he pretended to befriend several of the defendants. Ortiz

---

[1] For entrapment purposes, an individual hired by the government as a cooperating witness qualifies as a "government agent." Luisi, 482 F.3d at 53.

-9-

pressed hard to get a number of weapons from co-defendants, and to get them quickly. Further, defendant says Ortiz made up stories about why he needed the weapons and why he needed them so quickly. These facts, however, whether standing alone or collectively, are insufficient to show improper inducement.

Most of the evidence on which Teleguez relies to show undue pressure was directed toward co-defendants, and was not designed to induce the co-defendants to put pressure on Teleguez. Entrapment is a personal defense; it is not additive to cover co-defendants not targeted by the government agent. See Luisi, 482 F.3d at 54-55; United States v. Bradley, 820 F.2d 3, 8 (1st Cir. 1987). The justification for the entrapment doctrine simply does not extend to pressure placed on co-defendants intended to affect only those co-defendants' actions.[2]

---

[2] This is not a case like Luisi where there was evidence that

> (1) a government agent specifically targeted the defendant in order to induce him to commit illegal conduct; (2) the agent acted through the middleman after other government attempts at inducing the defendant had failed; (3) the government agent requested, encouraged, or instructed the middleman to employ a specified inducement, which could be found improper, against the targeted defendant; (4) the agent's actions led the middleman to do what the government sought, even if the government did not use improper means to influence the middleman; and (5) as a result of the middleman's inducement, the targeted defendant in fact engaged in the illegal conduct.

In the larger context of this case, the basis for an entrapment instruction is even weaker. Before Ortiz and Teleguez met for the first time on June 24, 2002 at Teleguez's home, Ortiz had already bought two rifles from co-defendants Buynovskiy and Zhernov, one of which had been previously owned by defendant.

In total, Ortiz completed eight firearms transactions with Teleguez and his co-defendants. Over the course of these transactions, Ortiz and Teleguez had three face-to-face meetings. As the district court noted, when Ortiz visited defendant's house in Pennsylvania, Teleguez stated almost immediately that he was ready to do business. Within approximately one hour, Teleguez had sold Ortiz four firearms. Two months later, on August 25, 2002, the defendant traveled to Massachusetts and personally sold Ortiz eight firearms. Five days later, he sold Ortiz another two firearms, also in Massachusetts. There is no showing of any resistance on Teleguez's part to selling weapons, much less any resistance which was overcome by improper government pressure. Defendant was an eager vendor of deadly weapons.

Having considered the broader record, we agree that Teleguez did not make the requisite entry-level showing for an entrapment instruction. Cf. United States v. Joost, 92 F.3d 7, 12-14 (1st Cir. 1996) (holding that defendant was entitled to entrapment instruction where jury could have found, inter alia,

Luisi, 482 F.3d at 55.

-11-

that defendant resisted agents' requests, defendant employed a general strategy of deflecting agents' requests, agents deliberately created a financial dependency, and agents threatened defendant's continued income).  The district court properly denied defendant's request for an instruction on entrapment.

As to the district court's decision to preclude Teleguez from arguing entrapment at closing, we find no abuse of discretion. See Wood, 982 F.2d at 4.  The trial court "has broad discretion over the scope of summations."  United States v. Grabiec, 96 F.3d 549, 552 (1st Cir. 1996).  After the close of evidence, having already correctly determined that Teleguez was not entitled to an entrapment instruction, the district court informed defense counsel that he would be precluded from arguing entrapment in his closing argument.  Defense counsel initially believed that the district court had prohibited him from arguing neutral facts that had been developed in relation to the desired entrapment defense.  The court clarified, however, that it was only prohibiting defense counsel from arguing a theory of entrapment; there was no limitation on arguing facts.  The district court's decision was well within its discretion.

B.        Denial of Motion To Dismiss, on Interstate Commerce Grounds, Charges of Possession of a Firearm with an Obliterated Serial Number

The district court denied Teleguez's pre-trial motion to dismiss the charges brought against him under 18 U.S.C. § 922(k).

-12-

Teleguez argues that dismissal of the charges under 18 U.S.C. § 922(k) was required both because § 922(k) involves an impermissible exercise of Congress's Commerce Clause powers, and because the evidence was insufficient to support a conviction under the statute. Our review of legal questions is de novo, and we review the entire record on Teleguez's sufficiency claim. See United States v. García-Carrasquillo, 483 F.3d 124, 129 (1st Cir. 2007); United States v. Rodriguez, 457 F.3d 109, 113 (1st Cir. 2006).

Section 922(k) prohibits possession of firearms with obliterated or altered serial numbers.[3] The statutory text requires proof that the firearm "has, at any time, been shipped or transported in interstate or foreign commerce."[4]

---

[3] 18 U.S.C. § 922(k) provides:

It shall be unlawful for any person knowingly to transport, ship, or receive, in interstate or foreign commerce, any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce.

[4] Teleguez cites a case from the Ninth Circuit, United States v. Stewart, 348 F.3d 1132 (9th Cir. 2003), vacated, 545 U.S. 1112 (2005), to support his argument that § 922(k) falls outside Congress's Commerce Clause powers and/or cannot constitutionally be applied to him. Stewart, however, considered 18 U.S.C. § 922(o), which -- unlike § 922(k) -- does not contain an express interstate commerce element. See 18 U.S.C. § 922(o); Stewart, 348 F.3d at 1134. Further, on remand from the Supreme Court, the Ninth Circuit

-13-

We have already held that § 922(k) is a constitutional exercise of Congress's Commerce Clause powers. See Diaz-Martinez, 71 F.3d at 953. Teleguez argues, however, that in light of the Supreme Court's more recent decisions in Jones, 529 U.S. 848, and Morrison, 529 U.S. 598, we should revisit Diaz-Martinez and hold that evidence that a firearm was manufactured in one state and possessed by defendant in another state is insufficient to justify a conviction under § 922(k). Teleguez mixes the question of Congress's power to regulate with the different question of sufficiency of the evidence.

Our opinion in Diaz-Martinez, which was decided after United States v. Lopez, 514 U.S. 549 (1995),[5] remains good law. Other circuits, post-Lopez, have upheld § 922(k) against similar attacks. See United States v. Baer, 235 F.3d 561, 563 (10th Cir. 2000); United States v. Mack, 164 F.3d 467, 473 (9th Cir. 1999). Indeed, our sister circuits have held that virtually identical

reconsidered § 922(o) in light of Gonzales v. Raich, 545 U.S. 1 (2005), and held that the statute could be constitutionally applied to Stewart's possession of homemade machine guns. United States v. Stewart, 451 F.3d 1071, 1078 (9th Cir. 2006). Teleguez has failed to note that the Ninth Circuit has, in fact, upheld § 922(k) on interstate commerce grounds. United States v. Mack, 164 F.3d 467, 473 (9th Cir. 1999).

[5] In Lopez, the Supreme Court held that the Gun-Free School Zones Act of 1990, 18 U.S.C. § 922(q)(1)(A), which contained no interstate commerce element, was beyond Congress's Commerce Clause powers because gun possession in a local school zone did not qualify as economic activity that substantially affected interstate commerce. 514 U.S. at 561-62, 567-68.

-14-

interstate commerce elements in other federal criminal statutes survive challenges under Jones and Morrison. See, e.g., United States v. Thompson, 359 F.3d 470, 480 (7th Cir.) (upholding 18 U.S.C. § 922(g)(1)), cert. denied, 543 U.S. 844 (2004); United States v. Rousseau, 257 F.3d 925, 932-33 (9th Cir.) (reaffirming constitutionality of 18 U.S.C. § 922(g)(8) and § 922(g)(1)), cert. denied, 534 U.S. 1013 (2001); United States v. Dorris, 236 F.3d 582, 584-86 (10th Cir. 2000) (upholding 18 U.S.C. § 922(g)(1)), cert. denied, 532 U.S. 986 (2001); United States v. Napier, 233 F.3d 394, 400-02 (6th Cir. 2000) (upholding 18 U.S.C. § 922(g)(8)).

The reasoning for upholding § 922(k) in the aftermath of Jones and Morrison is the same as that provided in the cases cited above. Congress has not exceeded the scope of its Commerce Clause powers in enacting § 922(k) because the statute prohibits the possession of firearms with obliterated serial numbers only if such firearms have been "shipped or transported in interstate or foreign commerce." So restricted by its own text, § 922(k) does not present a constitutional problem -- Congress may permissibly regulate the channels and instrumentalities of interstate commerce, as well as activities that substantially affect interstate commerce. See Lopez, 514 U.S. at 558-59; United States v. Morales-De Jesús, 372 F.3d 6, 9 (1st Cir. 2004).

From the constitutional analysis, it follows that the evidence was sufficient. The prosecution offered expert testimony

that twenty-two of the twenty-five firearms at issue necessarily had crossed state or foreign lines because they were originally manufactured in other states or countries. The interstate commerce argument is especially misplaced here, where Teleguez traveled from his home in Pennsylvania, across a number of state lines, to sell firearms to Ortiz in Massachusetts.

C.        Denial of Motions To Suppress Post-Arrest Statement

After defendant had signed a voluntary and knowing waiver of his Miranda rights, ATF agent Bernie Tuerler asked Teleguez how many illegal guns he had and how many illegal guns he had sold. Defendant did not respond. Teleguez was then asked who removed the serial numbers and reblued[6] the guns which he sold. Teleguez answered, "Well, Alex is the one who reblued the guns and removed the serial numbers." Only then did defendant say, "I think I'm going to get a lawyer."[7]

The district court denied defendant's pre-trial motion to suppress the statement that Alex was the one who reblued the guns and removed the serial numbers.[8] The court similarly denied

---

[6]        "Rebluing" is the process of refinishing the surface of a firearm after the chemical finish of the firearm has been worn off.

[7]        The trial judge instructed the jury not to draw any inference from Teleguez's invocation of his right to counsel.

[8]        Teleguez asserts that the challenged statement was the government's only evidence that he had knowledge that the serial numbers on firearms had been altered or removed. This is not so.

-16-

defendant's pre-admission and post-admission suppression motions at trial. The court noted that the agent's questions were put to Teleguez in "fairly quick succession" and concluded that defendant's mere hesitation or non-response to previous questions did not justify suppression. Our appellate review of the denials of defendant's motions is bifurcated. We review findings of fact for clear error; we review conclusions of law de novo. United States v. Coplin, 463 F.3d 96, 100 (1st Cir. 2006).

Teleguez argues that there was a Miranda violation and relies on the facts that (1) just before he made the challenged statement he had not answered Tuerler's questions about how many illegal guns he had and how many illegal guns he had sold, and (2) just after the statement he said, "I think I'm going to get a lawyer." See Miranda v. Arizona, 384 U.S. 436, 444-45 (1966). Teleguez argues that his silence in response to questions about the number of illegal guns was "tantamount" to the invocation of his right to remain silent, and that his subsequent invocation of his right to an attorney confirms that his earlier state of mind in not answering questions was to exercise his Miranda rights, his prior written waiver notwithstanding.

Miranda addresses two different rights: the right to remain silent and the right to counsel. See id. at 444; Bui v. DiPaolo, 170 F.3d 232, 239 (1st Cir. 1999). The record is clear that Teleguez did not request counsel until after he made the

-17-

statement, so his right to counsel is not at issue.  That leaves the question of whether he had invoked his right to remain silent. He had not.

A defendant's choice, after signing a Miranda waiver, to selectively answer questions, is not in itself an unequivocal assertion of his right to remain silent.  There is no other evidence to support the argument that Teleguez asserted his right to remain silent.  See Bui, 170 F.3d at 239; cf. Davis v. United States, 512 U.S. 452, 461-62 (1994) ("If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him.").

The district court correctly held that Teleguez's statement was admissible.

D.        Denial of Motion for Judgment of Acquittal

At the close of the evidence, the district court denied Teleguez's motion for a judgment of acquittal as to the three counts of possession of firearms with obliterated serial numbers. The court rejected the argument that defendant did not know at the time of possession that serial numbers had been removed from many of the guns he sold to Ortiz.  We review the matter de novo, see United States v. O'Shea, 426 F.3d 475, 479 (1st Cir. 2005), and affirm.

The statute, 18 U.S.C. § 922(k), requires the defendant to have knowingly possessed firearms with obliterated serial

numbers.  See United States v. Hooker, 997 F.2d 67, 74 (5th Cir. 1993).  Defendant argues that his statement that "Alex is the one who reblued the guns and removed the serial numbers" is not a statement that Teleguez had this knowledge at the time he possessed the firearms.  That is true, but it is hardly dispositive.

The government's case did not rest merely on Teleguez's statement, so we do not face the abstract question of whether inferences from defendant's statement would suffice to meet the government's burden of proof.  On August 25, 2002, Teleguez personally sold six firearms with obliterated serial numbers to Ortiz in Massachusetts.  The same was true of the two firearms defendant sold to Ortiz on August 30, 2002.  Further, on October 3, 2002, Teleguez arranged for Zhernov to deliver to Ortiz another firearm with an obliterated serial number, for which Teleguez received $850.  It is easy to infer that Teleguez was familiar with the guns he was selling and knew quite well that the serial numbers had been obliterated.  This conclusion that Teleguez had the requisite knowledge is further supported by Quickel's testimony that he had purchased firearms with intact serial numbers for Teleguez, and by Agent Burns's testimony explaining the similarities between Quickel's purchases for Teleguez and numerous firearms with obliterated serial numbers that defendant sold to Ortiz.  The evidence was sufficient.

The conviction is affirmed.