**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 11-9**

IVAN TELEGUZ,

              Petitioner - Appellant,

        v.

DAVID ZOOK, Warden, Sussex I State Prison,

              Respondent - Appellee.

**No. 14-2**

IVAN TELEGUZ,

              Petitioner - Appellant,

        v.

DAVID ZOOK, Warden, Sussex I State Prison,

              Respondent - Appellee.

Appeals from the United States District Court for the Western District of Virginia, at Roanoke.  James P. Jones, District Judge.  (7:10-cv-00254-JPJ)

Argued:  September 16, 2015          Decided:  November 30, 2015

Before MOTZ and WYNN, Circuit Judges, and DAVIS, Senior Circuit Judge.

Affirmed by published opinion. Judge Wynn wrote the opinion, in which Judge Motz joined. Senior Judge Davis wrote a separate opinion concurring in part and dissenting in part.

_____

**ARGUED:** Michael Francis Williams, KIRKLAND & ELLIS LLP, Washington, D.C., for Appellant. Alice Theresa Armstrong, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** Kenneth W. Allen, William P.J. Kimmitt, KIRKLAND & ELLIS LLP, Washington, D.C.; Matthew C. Stiegler, Philadelphia, Pennsylvania; Elizabeth J. Peiffer, VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Charlottesville, Virginia, for Appellant. Mark R. Herring, Attorney General of Virginia, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

_____

WYNN, Circuit Judge:

In 2006, a jury convicted Ivan Teleguz of capital murder for hire of his ex-girlfriend. After making his way through the Virginia state courts, Teleguz sought habeas corpus relief in federal court. In 2012, this Court held that the district court had failed to engage in a sufficient inquiry into Teleguz's habeas petition, particularly as it related to his gateway innocence claim. Accordingly, we remanded for reconsideration.

Before us now is the fruit of that remand. After a several-day evidentiary hearing, the district court made determinations using the appropriate legal standard and supported by the record. The district court's denial of Teleguz's petition for a writ of habeas corpus therefore stands.

I.

In 2001, Stephanie Sipe was found murdered in the Harrisonburg, Virginia apartment she shared with her infant son. While Teleguz, Sipe's ex-boyfriend and her son's father, had been a suspect, the investigation had stalled until Aleksey Safanov,[1] imprisoned in Massachusetts on federal charges, provided a tip to United States Marshal Michael Nelson that "he knew of a Russian male that had his wife killed. He said that a

---

[1] Safanov was also Teleguz's co-defendant in a firearms possession and sales case in which Safanov pled guilty and Teleguz went to trial and was convicted on all counts. United States v. Teleguz, 492 F.3d 80 (1st Cir. 2007).

Russian male hired a black male from Pennsylvania, Lancaster, Pennsylvania to kill his wife." J.A. 2828. Safanov's tips led to Edwin Gilkes, and U.S. Marshal Nelson passed the information on to the Harrisonburg Police Department. Ultimately, the investigation resulted in, among other things, a capital murder for hire case against Teleguz.

In February 2006, a jury convicted Teleguz of murder for hire. Teleguz v. Pearson, 689 F.3d 322, 325 (4th Cir. 2012). Michael Hetrick, who had actually committed the killing, testified at trial that Teleguz had paid him two thousand dollars to slit Sipe's throat.

Hetrick's murder-for-hire allegations were corroborated by both Gilkes and Safanov. Gilkes testified that he had been present at a birthday party where Teleguz hired Hetrick to commit the murder. Gilkes also testified that he accompanied Hetrick to Sipe's apartment and waited outside for Hetrick during the murder. Gilkes further claimed that he was afraid of Teleguz because he had heard rumors that Teleguz was a member of the Russian mafia.

Safanov testified at Teleguz's trial that Teleguz attempted to hire him to murder Sipe to avoid paying child support. Safanov also testified that Teleguz had spoken to him about the murder after it had occurred, complaining that the man he had hired to kill Sipe had left blood at the scene and offering

4

Safanov money to "eliminate" the killer. Teleguz, 689 F.3d at 326.

In February 2006, a Virginia jury recommended that Teleguz be sentenced to death upon finding two statutory aggravating factors: vileness and future dangerousness. The Supreme Court of Virginia affirmed Teleguz's conviction and sentence. Teleguz v. Commonwealth, 643 S.E.2d 708 (Va. 2007). Teleguz proceeded to file a petition for writ of habeas corpus in state court, which the Supreme Court of Virginia dismissed. Teleguz v. Warden of Sussex I State Prison, 688 S.E.2d 865 (Va. 2010).

Teleguz then turned to the federal courts, filing a petition for writ of habeas corpus in the United States District Court for the Western District of Virginia in November 2010. Some of Teleguz's claims had been adjudicated on the merits in state court while others had been procedurally defaulted. Teleguz, 689 F.3d at 326. Teleguz argued that his defaulted claims should nevertheless be considered, primarily because he had new, reliable evidence that he was actually innocent ("Gateway Innocence Claim").

In support of his Gateway Innocence Claim, Teleguz offered what we previously described as three categories of evidence. First, Teleguz presented affidavits of witnesses who indicated that they had not seen him at the birthday party during which he was alleged to have hired Hetrick to kill Sipe. Second, he

5

presented evidence to establish that a murder in Ephrata, Pennsylvania alluded to during his trial never occurred. Third, and most importantly, Teleguz presented affidavits in which Gilkes and Safanov recanted testimony they offered at Teleguz's trial.

Gilkes claimed that he had been coerced into testifying against Teleguz by the prosecutor, who "made clear that if [he] did not, [he] would have been the one on death row today, not Teleguz." J.A. 3546. Gilkes executed affidavits in both 2008 and 2010 disavowing aspects of his trial testimony.

Similarly, Safanov, who had left the United States for Kazakhstan and Kyrgyzstan, ostensibly submitted an affidavit. According to that affidavit, as well as affidavits submitted by Teleguz's defense team, which had been in contact with someone claiming to be Safanov, Safanov asserted that he had never discussed Sipe's murder with Teleguz and agreed to testify falsely during Teleguz's trial because both the prosecutor pursuing Teleguz and a United States marshal told him that if he cooperated, he would be eligible for perks including an S visa allowing him to remain in the United States despite pending gun charges.

In August 2011, the district court denied Teleguz habeas relief without holding a hearing. Teleguz v. Kelly, 824 F. Supp.2d 672 (W.D. Va. 2011). Teleguz appealed, arguing that he

6

was "entitled to an evidentiary hearing to demonstrate a miscarriage of justice." Petitioner's Br. at ii. This Court vacated and remanded for a rigorous Gateway Innocence Claim analysis, strongly suggesting that an evidentiary hearing may be warranted to assess the credibility of the recanting witnesses. Teleguz, 689 F.3d 322.

On remand in district court, Teleguz changed his tune, "arguing that an evidentiary hearing [was] unnecessary" and that the district court should decide his Gateway Innocence Claim "on the cold record." Teleguz v. Pearson, No. 7:10CV00254, 2012 WL 6151984, at *2 (W.D. Va. Dec. 11, 2012). "In light of th[is Court's] instructions," however, the district court found that an evidentiary hearing was "necessary." Id. at *3. Accordingly, it held a several-day evidentiary hearing in November 2013.

At the hearing, Gilkes appeared but refused to testify. And Safanov did not appear, even by deposition or phone. In other words, neither of the recanters testified in support of their recantations. Meanwhile, Hetrick appeared and testified in detail and consistent with his trial testimony, i.e., that Teleguz had hired him to kill Sipe. Prosecutor Marsha Garst, whom Gilkes and Safanov accused of threatening them into testifying against Teleguz, appeared and testified that those accusations were false. And U.S. Marshal Nelson testified that

7

Safanov's accusation that Nelson had told Safanov he could benefit from an S visa for assisting the government was also false.

Ultimately, in July 2014, the district court again denied Teleguz's petition. The district court held that it "c[ould] not conclude that more likely than not, given the overall, newly supplemented record, no reasonable juror would have found Teleguz guilty beyond a reasonable doubt. As such, the petitioner has not made a threshold showing of actual innocence to permit review of his procedurally-defaulted claims." Teleguz v. Davis, No. 7:10CV00254, 2014 WL 3548982, at *20 (W.D. Va. July 17, 2014) (quotation marks and citation omitted). The district court also rejected Teleguz's claim that he had made a sufficient showing that his habeas attorneys had been deficient in failing to pursue the Ephrata, Pennsylvania murder issue ("Martinez Claim"). This appeal ensued. We now review the district court's denial of Teleguz's habeas petition de novo. Wolfe v. Johnson, 565 F.3d 140, 160 (4th Cir. 2009).

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") sharply limits federal habeas relief. Sharpe v. Bell, 593 F.3d 372, 378-79 (4th Cir. 2010). If a state court adjudicates a petitioner's claims on the merits, a federal court may provide relief only if the resulting state court decision

8

"[i]s contrary to or involved an unreasonable application of federal law" or "[i]s based on an unreasonable determination of the facts in light of the evidence" that was before it. 28 U.S.C. § 2254(d).

Generally, a federal court may not consider claims that a petitioner failed to raise at the time and in the manner required under state law. House v. Bell, 547 U.S. 518, 536 (2006). Exceptions exist, however, when "the prisoner demonstrates cause for the default and prejudice from the asserted error." Id.

One such exception is made for cases in which a compelling showing of actual innocence enables a federal court to consider the merits of a petitioner's otherwise defaulted claims. See Schlup v. Delo, 513 U.S. 298 (1995). In such cases, new evidence "establish[es] sufficient doubt about [a petitioner's] guilt to justify the conclusion that his execution would be a miscarriage of justice unless his conviction was the product of a fair trial." Id. at 316 (emphasis omitted).

Another such exception exists for ineffective-assistance-of-trial-counsel claims where "(1) the ineffective-assistance-of-trial-counsel claim is a substantial one;" (2) the "cause" for default "consist[s] of there being no counsel or only ineffective counsel during the state collateral review proceeding;" (3) "the state collateral review proceeding was the

9

initial review proceeding in respect to the ineffective-assistance-of-trial-counsel claim;" and (4) state law requires that an ineffective assistance claim "be raised in an initial-review collateral proceeding." Fowler v. Joyner, 753 F.3d 446, 461 (4th Cir. 2014), cert. denied, 135 S. Ct. 1530 (2015) (quotation marks and citations omitted). When these conditions are met, the merits of an otherwise defaulted ineffective assistance claim may be reached. Martinez v. Ryan, 132 S. Ct. 1309, 1320 (2012).

Both of these exceptions are, in essence, procedural mechanisms. If the requisite showing is made, they allow otherwise defaulted substantive claims to be reached on the merits. Id.; Sibley v. Culliver, 377 F.3d 1196, 1207 n.9 (11th Cir. 2004) (distinguishing between a substantive claim and a gateway claim through which a habeas petitioner must pass to have his substantive claims considered on the merits). Stated differently, although a petitioner claims actual innocence, for example, for purposes of asserting a gateway innocence claim, such an innocence claim "does not by itself provide a basis for relief. Instead, his claim for relief depends critically on the validity" of his procedurally defaulted claims. Coleman v. Hardy, 628 F.3d 314, 318 (7th Cir. 2010) (quotation marks omitted).

With this legal framework in mind, we turn to Teleguz's Schlup and Martinez arguments.

A.

With his main argument on appeal, Teleguz challenges the district court's rejection of his Gateway Innocence Claim. Teleguz contends that the district court's analysis was unsound and that its conclusion constitutes reversible error. With both contentions, we disagree.

When a petitioner raises a gateway innocence claim, it must be supported by "new **reliable** evidence." Schlup, 513 U.S. at 324 (emphasis added). However, in its consideration of a petitioner's Schlup gateway innocence claim, the district court "must consider 'all the evidence' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial.'" House, 547 U.S. at 538 (quoting Schlup, 513 U.S. at 327–28).

In cases with recantations, evidentiary hearings "may be necessary to assess whether [they] are credible. . . ." Teleguz, 689 F.3d at 331 (quotation marks and citation omitted). Without doubt, "the district court is permitted under Schlup to 'make some credibility assessments' when, as here, a state court has not evaluated the reliability of a petitioner's 'newly presented evidence [that] may indeed call into question the

11

credibility of the witnesses presented at trial.'" Id. at 331-32 (quoting Schlup, 513 U.S. at 330).

Ultimately, the district court must determine whether "it is more likely than not that no reasonable juror would have found [the] petitioner guilty beyond a reasonable doubt." Schlup, 513 U.S. at 328. Or, as this Court put it, "to satisfy the Schlup standard, a petitioner must . . . demonstrate that the totality of the evidence would prevent any reasonable juror from finding him guilty beyond a reasonable doubt, such that his incarceration is a miscarriage of justice." Teleguz, 689 F.3d at 329. Only then may the district court reach the merits of the petitioner's procedurally defaulted claims. House, 547 U.S. at 538.

The Supreme Court has underscored that "the Schlup standard is demanding" and permits merits review only in "extraordinary" cases. House, 547 U.S. at 538 (quotation marks omitted). See also McQuiggin v. Perkins, 133 S. Ct. 1924, 1936 (2013) ("We stress once again that the Schlup standard is demanding. The gateway should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.") (quotation marks and citation omitted). At the same time, though, the Schlup standard does not require absolute certainty about the

12

petitioner's innocence.  Rather, the petitioner must demonstrate that more likely than not, in light of new and reliable evidence, no reasonable juror would find him guilty beyond a reasonable doubt.  House, 547 U.S. at 538.

Based on the record before us now, we, like the district court, are unable to reach the conclusion that "the totality of the evidence would prevent any reasonable juror from finding [Teleguz] guilty beyond a reasonable doubt."  Teleguz, 689 F.3d at 329.

1.

We focus first on the Gilkes and Safanov recantations, which are at the heart of Teleguz's Gateway Innocence Claim. Gilkes recanted several key aspects of his trial testimony, which he claimed were the products of coaching and intimidation. Specifically, in his post-trial affidavits, Gilkes recanted, among other things, his claim that Teleguz was present at David Everhart's birthday party, where Hetrick contended that Teleguz had hired him to kill Sipe.  Further, Gilkes claimed that he "never heard or overheard Ivan Teleguz hiring Michael Hetrick to kill his ex-girlfriend," J.A. 3484, and claimed that he did not "know who hired Hetrick to kill Ms. Sipe, or if anyone hired him." J.A. 3548.

Gilkes claimed that he had been coerced into testifying against Teleguz by the prosecutor, who "made clear that if [he]

13

did not, [he] would have been the one on death row today, not Teleguz." J.A. 3546. Per, Gilkes "[m]ost of [his] testimony was fabricated," id., and he "said those things because Marsha Garst told [him] that she was only interested in information that put this murder on Ivan Teleguz." J.A. 3484. Gilkes plainly stated in his affidavits that Garst and Investigator Whitfield, the police detective on the case, told him to say that Teleguz was responsible for Ms. Sipe's murder. For example, Gilkes asserted:

> I said those things because Marsha Garst told me that she was only interested in information that put this murder on Ivan Teleguz. During at least one interrogation of me by Marsha Garst, she directed the investigator to turn off the tape recorder. While the tape was off, she told me that it was Ivan Teleguz that she was interested in. She already knew that Michael Hetrick had done the killing because she had his DNA at the scene. She said that any deal I got would depend on me giving her Ivan Teleguz, and she told me to give her as much about Ivan Teleguz as I could.

J.A. 3484.

Likewise, Safanov later claimed that he never discussed Sipe's murder with Teleguz and agreed to testify during Teleguz's trial only because both the prosecutor pursuing Teleguz and a United States marshal told him that if he cooperated, he would be eligible for perks including a visa allowing him to stay in the United States.

14

Because Safanov had left the United States, contact with him has been only long-distance. Teleguz's defense team had had conversations with someone claiming to be Safanov and submitted affidavits stating, for example:

> In the first phone call, we identified ourselves as Teleguz's lawyers. Safanov told us that Marcia [sic] Garst, the Commonwealth's Attorney who prosecuted Teleguz, guaranteed she would get Safanov an S Visa. An S Visa would allow him to stay in the country despite his criminal convictions. Garst promised Safanov she would get him an S Visa, if Safanov would help Garst get the death penalty for Teleguz.

J.A. 3555. Similarly, the recanting affidavit executed by someone claiming to be Safanov himself stated, among other things:

> Ivan has never told me that he had arranged to have Stephanie Sipe killed, and my testimony at his capital murder trial, that he did tell me this, was false. I was pressured by Marsha Garst, the Virginia prosecutor in Ivan's capital case, to testify that Ivan had arranged the murder so that Ivan would get the death penalty. In exchange for my testimony, Garst offered to help me in a number of ways, including help getting a good deal on federal criminal charges I was facing at the time.

J.A. 3595.

Neither Safanov nor Gilkes testified at the evidentiary hearing. The district court thus noted its "limited ability to judge their truthfulness." Teleguz, 2014 WL 3548982, at *9.

By contrast, the government witnesses accused of misconduct—Garst, Whitfield, and Nelson—testified at the

15

evidentiary hearing. For example, Safanov claimed Garst had visited him in prison with cookies she had baked for him. Garst's response at the evidentiary hearing: "I do not bake cookies for inmates, nor would I have done that." J.A. 2893. When asked if she had made Safanov any guarantees about an S visa, she flatly denied any such allegations, noting "I'm a local state constitutional officer; I cannot make such a representation." J.A. 2892. And Garst flatly denied having instructed either Safanov or Gilkes to lie—either to secure Teleguz's capital conviction or for any other reason.

Similarly, when U.S. Marshal Nelson was asked, for example, if he had spoken "with Mr. Safanov about any visa issues that he was facing," he flatly denied with a "No, sir." J.A. 2838. Nelson similarly denied having any discussions with Safanov's girlfriend about Safanov's visa issues. Instead, Nelson confirmed that he had not even known about the S visa program for government cooperators at the pertinent time. Nelson also made plain that he had had no involvement with the Virginia investigation of the Sipe murder after he relayed to the Harrisonburg police the tip information that rekindled the stalled investigation and ultimately led to Teleguz.

Despite the claims of prosecutorial misconduct, at the evidentiary hearing, Garst, Whitfield, and Nelson testified and denied Gilkes's and Safanov's accusations of coaching,

16

intimidation, and misconduct. Teleguz's counsel had the opportunity to cross-examine these witnesses. And the district court found Garst's, Nelson's, and Whitfield's versions of the pertinent events "reasonable," and their testimony "credible." Teleguz, 2014 WL 3548982, at *10-11.

In other words, the district court had before it affidavits asserting that Gilkes and Safanov had falsely testified about Teleguz's guilt at the behest of the prosecution. But the recanting affiants chose not to testify and were not subject to cross-examination. Meanwhile, the government witnesses implicated in Gilkes's and Safanov's affidavits took the stand and gave reasonable accounts that the district court believed. The district court therefore credited the prosecution's version of events and discredited Gilkes's and Safanov's versions, specifically finding the recanting affidavits "unreliable." Teleguz, 2014 WL 3548982, at *10.

When we remanded this matter for an evidentiary hearing—at Teleguz's express request—we made plain that the district court could, and indeed, might need to, make credibility determinations. Teleguz, 689 F.3d at 331. See also Schlup, 513 U.S. at 330 ("[T]he newly presented evidence may indeed call into question the credibility of the witnesses presented at trial. In such a case, the habeas court may have to make some credibility assessments."). The district court heard our

17

instructions loud and clear, held a several-day hearing, and made the necessary credibility determinations.[2]

Credibility determinations are "deserving of the highest degree of appellate deference." Evergreen Int'l, S.A. v. Norfolk Dredging Co., 531 F.3d 302, 308 (4th Cir. 2008) (quotation marks and citation omitted). See also, e.g., O'Dell v. Netherland, 95 F.3d 1214, 1250 (4th Cir. 1996) (en banc) (noting that "the district court's factual findings regarding the credibility of testimony it has actually heard are findings subject to review only under a clearly erroneous standard"). Indeed, the court below, and "not the reviewing court, weighs the credibility," and we generally "do not review credibility determinations." Smith v. Bank of Am., N.A., 443 F. App'x 808, 809 (4th Cir. 2011) (unpublished).

We see no basis for substituting our own credibility determinations for the district court's. Gilkes and Safanov claimed that they lied at trial because they were instructed and intimidated into doing so by the prosecution. But Gilkes and Safanov refused to testify at the evidentiary hearing and affirm their recantations or be subject to cross-examination. Meanwhile, the implicated prosecution witnesses—Garst,

---

[2] Nowhere in our prior opinion did we "order," Petitioner's Br. at 28, the district court to make a finding on remand regarding whether the circumstances surrounding the Gilkes and Safanov recantations were the result of coercion, bribery, or misdealing.

18

Whitfield, and Nelson—did testify, were cross-examined by Teleguz's counsel, and were deemed credible. Under these circumstances, we uphold the district court's determination that the recanting affidavits did not constitute the "reliable" new evidence that Schlup requires. Schlup, 513 U.S. at 324.[3]

2.

In contrast to Gilkes and Safanov, Hetrick testified at the evidentiary hearing. Teleguz argues that the district court erred in finding Hetrick's testimony credible. Again, we see no basis for disturbing the district court's determination.[4]

At trial and at the evidentiary hearing, Hetrick testified that Teleguz agreed to pay him two thousand dollars to kill Sipe, who had taken money and drugs from Teleguz and sought child support for their infant son. Teleguz later drove Hetrick and Gilkes from Lancaster, Pennsylvania to Harrisonburg, Virginia, where Sipe lived, showed them her apartment, and then left them to establish an alibi. Hetrick gained entry into the

---

[3] The district court also noted inconsistencies and gaps in the recanting affidavits. That discussion is, however, tangential to the larger thrust, i.e., the prosecutorial intimidation and influence, which is thus our focus.

[4] Teleguz plainly overreaches in trying to suggest that in stating "having observed his demeanor and testimony first-hand, I believe that Hetrick's evidence alone was sufficient to have convinced the jury of Teleguz's guilt," Teleguz, 2014 WL 3548982, at *17, the district court thereby "rejected" the state court's statement that "to return a guilty verdict, the jury had to believe the testimony of Safanov, Gilkes, and Hetrick." Petitioner's Br. at 30-32.

19

apartment and slit Sipe's throat as Teleguz had directed. However, Sipe fought back and, in the struggle, Hetrick wounded his hand with his own knife. Afterwards, while cleaning his wound, he discovered the couple's infant son in the bathtub. Hetrick turned off the bathtub water and left.

The district court had the opportunity to "observe[] [Hetrick's] demeanor and testimony first-hand" and found his account detailed, consistent with his trial testimony, and "highly creditable." Teleguz, 2014 WL 3548982, at *17. The district court did not wholly discount Hetrick's testimony because he secured a better deal with the government for cooperating or because of the risks associated with later changing his account. Instead, the district court noted, for example, that "[l]eniency for government cooperators is common, and absent evidence of other misconduct, their motivation to help themselves does not render their statements necessarily unreliable." Id. at *16. Again, credibility determinations are "deserving of the highest degree of appellate deference," Evergreen Int'l, S.A., 531 F.3d at 308 (quotation marks and citation omitted), and we see no basis for swapping the district court's credibility determination out in favor of our own.

Teleguz attempts to make much of the fact that the district court, at the warden's request, appointed Hetrick—and Gilkes—independent counsel for purposes of the evidentiary hearing. We

20

refuse Teleguz's invitation to read impropriety into either the warden's or the district court's looking out for Gilkes's, Hetrick's, or anyone's, rights and interests by appointing them independent counsel under circumstances such as these. And while the language the warden's counsel used in the motions to appoint independent counsel was, no doubt, stark, the warden's counsel was stating a seemingly obvious truth: that testifying at an evidentiary hearing in a manner that contradicted how they testified at trial could have serious legal consequences such as perjury or broken plea agreements for Gilkes, Safanov, Hetrick, or any witness.

Further, Teleguz heavily relies on Wolfe v. Clarke, 718 F.3d 277 (4th Cir. 2013), cert. denied, 134 S. Ct. 1281 (2014). But we fail to see how Wolfe advances the ball for Teleguz. In Wolfe, the prosecution illicitly threatened a recanting witness whose recantation had already been deemed candid and persuasive at an evidentiary hearing to impact how he would testify at Wolfe's retrial. Indeed, the Wolfe proceedings were riddled with grave prosecutorial misconduct such as interview recordings that authorities refused to hand over and joint meetings with key witnesses to choreograph and coordinate testimony. Under those circumstances, the district court found that Wolfe had met the Schlup standard and that he had presented meritorious claims. Id. at 280-81. Yet even in the face of all that, this

Court held that the district court abused its discretion in barring the government from retrying Wolfe, stating "[w]e are confident that the retrial will be properly handled, and, if convictions result, that the appellate courts will perform their duties." Id. at 289.

3.

Teleguz also contends that he "presented substantial evidence that he was not even present at the birthday party" where, according to Hetrick's and Gilkes's trial testimony and Hetrick's hearing testimony, Teleguz had hired Hetrick to kill Sipe. Petitioner's Br. at 41. According to Teleguz, this undermines the credibility of Hetrick's story. In reality, however, the evidence presents a much more mixed picture as to whether Teleguz attended the birthday party.

Teleguz submitted several affidavits in which individuals stated that they had not seen Teleguz at the birthday party. Importantly, two such affidavits belonged to the party hosts, whom Teleguz deposed de bene esse before the evidentiary hearing. The female host—Latesha Everhart, who is also Gilkes's sister—testified at deposition that her husband was so drunk the night of the party that he would not have been in a position to know who was there.

Further, and crucially, Everhart testified that "half of the stuff in [her affidavit] isn't true." J.A. 3231. She

22

stated that Teleguz "could have been there." J.A. 3204. "Edwin [Gilkes] could have let him in upstairs without coming through the front door." J.A. 3237.[5] In other words, the party hosts had no idea whether Teleguz was at the party or not. The female host thus expressly disavowed the statement in her affidavit that "Ivan Teleguz was definitely not at my husband['s] birthday party." J.A. 3204. What's more, she raised serious questions about the integrity of the affidavits.[6]

In light of the open question the affidavits present as to whether Teleguz had attended the birthday party, we share the district court's reluctance to find this evidence to be the kind of "reliable" new evidence needed to meet the demanding Schlup standard. Schlup, 513 U.S. at 324

4.

The last category of evidence supporting Teleguz's Gateway Innocence Claim purportedly establishes that the Ephrata, Pennsylvania murder alluded to during Teleguz's trial never occurred. But this evidence, even more than the other

---

[5] Gilkes independently confirmed that, to enter his room, he would "go up through the back of the house through the fire escapes and come in through a window." J.A. 4372.

[6] Everhart testified in her deposition that a young woman visited her, wrote some things down, and left. Several weeks later, Everhart was asked to sign a paper, presumably the affidavit, but never given her own copy. Everhart was asked: "Do you have any reason to think that the affidavit you signed was altered or changed?" J.A. 3230-31. And she responded in the affirmative: "Yeah, I do . . . . Because half of the stuff in there isn't true." Id. at 3231.

23

categories already discussed, fails to add the requisite heft to Teleguz's Gateway Innocence Claim.

Gilkes's specific testimony about the Ephrata, Pennsylvania murder was that "down in Ephrata one day . . . a couple of [] Russians on Main Street were outside the parking lot of the rec center. There was two men that got out of the car. We figured they were both, they were both Russians to the best of my knowledge." J.A. 4420. Gilkes continued that "the one walked up and said that . . . if his boys didn't have the money at a certain time that in a couple of days that some of them would be killed." Id. at 4421. Gilkes testified that Teleguz did not make that statement but "was present during the statement." Id. Gilkes reported that someone was later killed, "a week, three days to a week after that in Ephrata Street, on Main Street." Id. at 4422. In other words, Gilkes plainly did not testify that Teleguz had killed anyone in Ephrata, Pennsylvania.

During the evidentiary hearing, Teleguz presented evidence that no murder had ever occurred outside the recreation center in Ephrata, Pennsylvania (though other evidence indicated that a murder in which Teleguz may have been involved had occurred in a nearby town). He thus suggested that the jury was misled into believing that he had been behind a phantom murder.

We fail to see how the Ephrata, Pennsylvania murder issue could show that Teleguz was actually innocent of Sipe's murder

24

in Harrisonburg, Virginia. The Ephrata, Pennsylvania murder-related evidence thus cannot support a determination that Teleguz had met the "demanding" Schlup standard. House, 547 U.S. at 538.

5.

Even in the face of the broadened record, we cannot say that this is the "rare" and "extraordinary" case in which it is more likely than not that no reasonable jury would have convicted Teleguz as the jury did here. House, 547 U.S. at 538, 554. A brief overview of a case in which the Supreme Court found the gateway innocence standard to be met is instructive regarding what a sufficiently strong gateway innocence case looks like and why the mixed picture here does not meet the standard.

In House, the defendant was convicted and sentenced to death in large part based on forensic evidence, specifically semen found on the victim's nightgown and underwear, and blood stains found on the defendant's pants. House, 547 U.S. at 540-41. Later DNA analysis, however, showed that the semen was in fact the victim's husband's, not the defendant's, and that the blood stains on the defendant's pants likely resulted from the victim's blood spilling out of vials taken into evidence and transported in the same container, at the same time, as the defendant's pants. Id. at 541-45. Further, there existed

25

evidence that the victim's husband physically abused her, that she had reported shortly before her death that she was afraid of her husband and wanted to leave him, and even that her husband had later confessed to having killed her. Id. at 548-49. While the Supreme Court stressed that "it bears repeating that the Schlup standard is demanding and permits review only in the 'extraordinary,' case," id. at 538, it deemed House to be that "rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." Id. at 554. This case, while perhaps troubling, is no House.

In sum, the district court applied the correct legal framework to the totality of the evidence before it. It made the credibility determinations we had indicated it had the authority to make. We must give those determinations "the highest degree of appellate deference," Evergreen Int'l, S.A., 531 F.3d at 308 (quotation marks and citation omitted). Particularly in light of those credibility determinations, we, like the district court, "cannot conclude that more likely than not, given the overall, newly supplemented record, no reasonable juror would have found Teleguz guilty beyond a reasonable doubt."[7] Teleguz, 2014 WL 3548982, at *20 (quotation marks and

---

[7] Teleguz seizes on the district court's use of the word "I" to suggest that the court failed to consider how a jury would

citation omitted).  And because the Gateway Innocence Claim was Teleguz's hook for moving past procedural default, we refrain from addressing the underlying, defaulted claims.

B.

With his second argument on appeal, Teleguz challenges the district court's rejection of his Martinez Claim.  Teleguz contends that the district court's analysis was fatally flawed by a mistaken belief that the jury had not been told that Teleguz had been involved in the Ephrata, Pennsylvania murder. We see no such fatal flaw.

As an initial matter, we note that the district court erred to the extent it suggested that Teleguz had failed to preserve the Martinez issue.  See Teleguz, 2014 WL 3548982, at *22 ("Martinez was decided by the Supreme Court on March 20, 2012, prior to oral argument in Teleguz's appeal to the Fourth Circuit, but was not raised there . . . .").  In footnote 12 on pages 23 to 24 of his pre-remand opening brief, Teleguz raised the Martinez issue and acknowledged the lack of then-extant

---

react to the newly supplemented evidentiary record.  We reject a myopic focus on the pronouns used but instead look to what the district court actually did.  Without doubt, the district court held that it was not "more likely than not, given the overall, newly supplemented record, [that] no reasonable juror would have found Teleguz guilty beyond a reasonable doubt." Teleguz, 2014 WL 3548982, at *20.  Teleguz's assertion that the district court "never answered" the "essential question" of whether "*reasonable jurors* . . . would still find guilt beyond a reasonable doubt," Petitioner's Br. at 26, is thus plainly incorrect.

27

legal support but expressly noted the argument for preservation purposes. We therefore move to the merits, which the district court also addressed.

Like Schlup, Martinez is an exception that enables habeas petitioners to obtain merits review of otherwise procedurally defaulted claims under certain circumstances. Specifically, Martinez claims may be reviewed only if, among other things, "the ineffective-assistance-of-trial-counsel claim is a substantial one," and the cause behind the default was "no counsel or only ineffective counsel" during the collateral review proceedings. Fowler, 753 F.3d at 461 (quotation marks and citations omitted).

Regarding the requirement that there be a "substantial" claim, the Supreme Court held that a prisoner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Martinez, 132 S. Ct. at 1318. Relatedly, to show ineffective assistance, "the petitioner must make a 'substantial' showing with respect to both counsel's competency (first-prong Strickland) and prejudice (second-prong Strickland)." Brian R. Means, Federal Habeas Manual § 9B:62 (citing Clabourne v. Ryan, 745 F.3d 362, 376 (9th Cir. 2014)).

28

As to the specific elements of the ineffective assistance claim, a petitioner must make a substantial showing of incompetency, i.e., "that counsel made errors so serious that counsel was not functioning as the counsel guaranteed . . . by the Sixth Amendment." DeCastro v. Branker, 642 F.3d 442, 450 (4th Cir. 2011) (quotation marks and citation omitted). Further, the petitioner must make a substantial showing that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable," i.e., that there was "a substantial, not just conceivable, likelihood of a different result." Id. (quotation marks and citations omitted).

Teleguz faults his state habeas counsel for failing to investigate and raise an ineffective assistance of trial counsel claim relating to the Ephrata, Pennsylvania murder allegations not just at the guilt phase but also at the penalty phase. According to Teleguz, "the jury was told that Teleguz was 'at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they'll be back for the other two.'" Petitioner's Br. at 59 (citing J.A. 4403).

In reality, however, the jury was not "told" that Teleguz "blew" anyone "away," but rather that Gilkes did not recall having made any such statement and that he saw no such thing. Specifically, on cross-examination, Gilkes was asked, "Do you

29

remember telling the investigators that you were at the recreation center in this small town and that Ivan Teleguz and two other people came in, walked up to some guy, blew him away and told you they'll be back for the other two?" J.A. 4403. Gilkes responded, "No, I don't recall it." Id. When asked again, "You don't recall saying that?" Gilkes again plainly stated "No." Id.

On redirect, Gilkes clarified: "[D]own in Ephrata one day . . . a couple of [] Russians on Main Street were outside the parking lot of the rec center. There was two men that got out of the car. We figured they were both, they were both Russians to the best of my knowledge." J.A. 4420. Gilkes continued that "the one walked up and said that . . . if his boys didn't have the money at a certain time that in a couple of days that some of them would be killed." Id. at 4421. Gilkes testified that Teleguz did not make that statement but "was present during the statement." Id. Gilkes reported that someone was later killed, "a week, three days to a week after that in Ephrata Street." Id. at 4422. But Gilkes did not state or suggest that he witnessed that murder or knew who had committed that murder—and he certainly did not testify, nor did any other trial witness, that Teleguz "blew someone away" in Ephrata, Pennsylvania.

The alleged Ephrata, Pennsylvania murder resurfaced during the prosecution's closing argument at sentencing. The

30

prosecutor stated "you heard the background of the defendant, how Gilkes told you about this issue in Ephrata, how they had this situation with the Russian folks approaching and posturing about killing someone, and someone ends up dead." J.A. 5209. Again, no one argued, much less presented evidence, that Teleguz "blew someone away" outside the Ephrata, Pennsylvania recreation center. Teleguz's suggestion that the jury was informed that "Teleguz was responsible for another murder" is, therefore, inaccurate. Petitioner's Br. at 60.

Because the jury heard evidence that at best shows that Teleguz was present when another individual threatened to murder someone outside the recreation center in Ephrata, Pennsylvania and that a murder did occur about a week later, and because the lone comment on the issue at sentencing, in the form of closing arguments, referenced "Russian folks" and did not state that Teleguz had murdered anyone in Ephrata, Pennsylvania, it comes as no surprise that habeas counsel failed to make the ineffective assistance claim that Teleguz now presses—one based on "a misconception of the evidence." Teleguz, 2014 WL 3548982, at *24.[8]

---

[8] Our own characterization of the evidence in our earlier opinion was also not as tightly tethered to the actual record as it could have been. But the trial transcript, quoted extensively above but not in our prior opinion, speaks for itself.

31

Moreover, had counsel fully pursued the Ephrata, Pennsylvania murder issue, they may well have decided to let things lie—because evidence presented at the hearing suggested that a murder with a connection to the Ephrata recreation center had in fact taken place and that Teleguz may have been involved. A Pennsylvania State Police "master trooper" who investigated Russian organized crime in Lancaster County testified that a man of Russian dissent named Yvegeniy Belyy was murdered in Elizabeth Township, Pennsylvania in April 2001. J.A. 2852. While investigating the Belyy murder, the Pennsylvania State Police interviewed "various individuals who talked about a fight or embarrassment at the Ephrata Rec Center or in that vicinity." Id. at 2855. The master trooper testified that "Ivan Teleguz first came to light in the [Belyy] homicide investigation." Id. at 2854. Record evidence also suggests that Teleguz may have been the source of the firearm for the Belyy murder (see, e.g., J.A. 3814)—a fact consistent with Teleguz's having been "an eager vendor of deadly weapons." Teleguz, 492 F.3d at 85.

A brief overview of a case in which the Supreme Court found prejudice is instructive as to why the record does not support finding prejudice here. In Wiggins v. Smith, 539 U.S. 510 (2003), the defendant was convicted of murder and sentenced to death. Wiggins's sentencing jury heard only one significant mitigating factor-that Wiggins had no prior convictions. Id. at

32

537. But "mitigating evidence counsel failed to discover and present in this case [was] powerful." Id. at 535. The evidence showed that "Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. [And] [t]he time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case." Id. Given this "powerful" evidence, the Supreme Court concluded that, "[h]ad the jury been able to place petitioner's excruciating life history on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." Id. at 537. Accordingly, the Supreme Court found the high prejudice bar to have been met. Without doubt, this case is no Wiggins.

Finally, completely independent of anything having to do with the Ephrata, Pennsylvania murder issue, the jury recommended that Teleguz be sentenced to death based on finding vileness beyond a reasonable doubt. Teleguz, 643 S.E.2d at 723 ("In this case, the Commonwealth presented evidence on both the vileness and future dangerousness aggravators. The jury found both aggravators were proven beyond a reasonable doubt."). Evidence supporting that finding included: Teleguz's having "planned the murder to avoid his responsibility of supporting

33

his child;" Teleguz's having directed that "the murder be committed in the apartment without regard to the well-being of his child who would likely be present;" and Teleguz's having specified "the actual manner of the murder—cutting the victim's throat," with physical attributes including "a deep stab wound to Sipe's neck which resulted in massive external and internal bleeding, causing Sipe to drown in her own blood." Id. at 724. In light of the independent, additional statutory aggravator of vileness, Teleguz's death sentence would stand regardless of his Martinez claim.

In sum, on the record as it exists—as opposed to how it has been mischaracterized—we must reject Teleguz's suggestion that "false evidence that Teleguz was responsible for another murder was the most powerful imaginable aggravating evidence" and thus also his contention that there exists a "reasonable probability that disproving that evidence would have changed the outcome." Petitioner's Br. at 65 (quotation marks and citation omitted). Instead, Teleguz has failed to "demonstrate that the claim"—grounded in a misconception of the trial transcript—"has some merit." Martinez, 132 S. Ct. at 1318. And he has likewise failed to make a substantial showing that his "counsel's errors were so serious as to deprive [him] of a fair trial, a trial

34

whose result is reliable." <u>DeCastro</u>, 642 F.3d at 450 (quotation marks and citation omitted).[9]

III.

For these reasons, we affirm the district court's dismissal of Teleguz's petition.

<u>AFFIRMED</u>

---

[9] While Teleguz argues that the district court should have allowed additional discovery and presentation on this claim, the record is replete with evidence about the Ephrata, Pennsylvania murder issue. Further, the "record refutes the applicant's factual allegations." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007). We thus reject this argument.

35

DAVIS, Senior Circuit Judge, concurring in part and dissenting in part:

I agree with my friends in the majority that Ivan Teleguz has failed to support his gateway innocence claim with sufficient evidence as required under Schlup v. Delo, 513 U.S. 298 (1995). I also agree that Teleguz preserved his ineffective assistance of counsel claim asserted under Martinez v. Ryan, 132 S. Ct. 1309 (2012). But I disagree, respectfully, with the conclusion that Teleguz has failed to satisfy Martinez. Because the district court prevented Teleguz from engaging in discovery on his Martinez claim, the record is too sparse to determine whether his state habeas counsel was ineffective. I would remand the case to the district court for further evidentiary development of Teleguz's Martinez claim. Accordingly, I concur in part and dissent in part.

I.

In 2001, Teleguz hired Edwin Gilkes and Michael Hetrick to kill Stephanie Sipe, Teleguz's ex-girlfriend. In February 2006, a jury convicted Teleguz of murder for hire. Gilkes, Hetrick, and Aleksey Safanov, a third prosecution witness, each testified at trial that he was approached by Teleguz and offered money to kill Sipe. Hetrick testified that he committed the murder and received payment soon thereafter. In addition to offering corroborating testimony, Gilkes testified, during the guilt

36

phase of the trial, that he once saw Teleguz and another man approach two men in a parking lot outside a recreation center in Ephrata, Pennsylvania. Gilkes testified that the man standing with Teleguz told the other two men that someone "would be killed" if certain debts went unpaid. J.A. 4421. Gilkes then testified that someone was in fact killed a few days later on Main Street in Ephrata. It has since been established that the Ephrata murder, as Gilkes described it, never occurred. Although prosecutors did not use the Ephrata murder testimony against Teleguz during the guilt phase, they used the testimony during the penalty phase of the trial to establish Teleguz's future dangerousness, one of two potential aggravating factors that might justify a death sentence.

Following trial, Teleguz exhausted claims for state habeas relief before pursuing federal habeas relief in the United States District Court for the Western District of Virginia. In an amended petition for writ of habeas corpus at the district court, Teleguz asserted, among other things, a Schlup gateway innocence claim. He also argued that his trial counsel was ineffective during the penalty phase because they failed to address the prosecution's evidence of future dangerousness— namely, his involvement in the alleged Ephrata murder. The district court denied Teleguz's amended petition. Teleguz v. Kelly, 824 F. Supp. 2d 672, 723 (W.D. Va. July 17, 2014).

37

Relevant here, the district court determined that his ineffective assistance of trial counsel claim was procedurally barred because he had failed to raise it during the state habeas proceedings. Id. at 695. Teleguz appealed, and we remanded the proceedings for further analysis of his Schlup gateway innocence claim. Teleguz v. Pearson, 689 F.3d 322, 330 (4th Cir. 2012).

On remand at the district court, and in an effort to resurrect his procedurally defaulted ineffective assistance of trial counsel claim, Teleguz raised a claim under Martinez that his state habeas counsel provided ineffective assistance because they, too, failed to investigate the alleged Ephrata murder. The district court concluded that, while our remand did not encompass the Ephrata murder claim, Teleguz's state habeas counsel "was not so deficient as to fall below the wide range of reasonable professional assistance," and his ineffective assistance of trial claim was not substantial. Teleguz v. Davis, No. 7:10CV00254, 2014 WL 3548982, at *25 (W.D. Va. July 17, 2014). The district court denied both Teleguz's Martinez claim and his request for additional discovery on the issue. Id. at *25–26.

## II.

On appeal, Teleguz argues under Martinez that his state habeas counsel was ineffective in their failure to investigate and present evidence that the alleged Ephrata murder never

38

occurred. The majority concludes that state habeas counsel was effective and that Teleguz cannot demonstrate prejudice as a result of any purported error on the part of state habeas counsel. It is here where the majority and I disagree. While the majority concludes that Teleguz loses on a merits review of his Martinez claim, I conclude there is insufficient evidence in the record to make a choice either way. The contention here, at its core, is whether Teleguz should be afforded further discovery on his Martinez claim so that there can be a more substantial evidentiary basis to resolve the issue.

We review a district court's decision not to grant discovery on a habeas claim for abuse of discretion. Stephens v. Branker, 570 F.3d 198, 207 (4th Cir. 2009). "'Rule 6(a) of the Rules Governing Section 2254 Cases requires a habeas petitioner to show good cause before he is afforded an opportunity for discovery.'" Id. (quoting Quesinberry v. Taylor, 162 F.3d 273, 279 (4th Cir. 1998)). A petitioner satisfies good cause "if the petitioner makes a specific allegation that shows reason to believe that the petitioner may be able to demonstrate that he is entitled to relief." Quesinberry, 162 F.3d at 279.

Before turning to whether Teleguz has demonstrated good cause, a description of the Martinez standard is appropriate. One avenue for a habeas court to review a procedurally defaulted

39

claim exists where the petitioner can demonstrate both cause for the default and prejudice as a result of the default. See Coleman v. Thompson, 501 U.S. 722, 750 (1991). In states like Virginia, where claims of ineffective assistance of trial counsel must be raised in initial post-conviction proceedings, see Lenz v. Commonwealth, 544 S.E.2d 299, 304 (Va. 2001), Martinez permits a petitioner to establish cause if the petitioner either lacked state habeas counsel or, under the standard established in Strickland v. Washington, 466 U.S. 668 (1984), state habeas counsel was ineffective, Martinez, 132 S. Ct. at 1318. A petitioner may establish prejudice if "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." Id. at 1318-19.

Strickland instructs that counsel's performance is deficient if it (1) falls below an objective standard of reasonableness, and (2) the deficiencies prejudiced the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 688, 692, 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

A.

The current record is insufficient to determine with confidence whether Teleguz's state habeas counsel's performance fell below an objective standard of reasonableness, and Teleguz has at least shown good cause for more discovery. The district court interpreted our remand order as limiting evidentiary development to the Schlup actual innocence claim. As a result, the district court precluded Teleguz from engaging in any additional discovery related to his Martinez claim. See Teleguz, 2014 WL 3548982, at *26.

At the start of the Schlup evidentiary hearing on remand, Teleguz's federal habeas counsel told the district court that they intended to present evidence on the Martinez issue. The district court responded that it was "disinclined to allow the petitioner to expand the scope of the hearing," but it would withhold final judgment on the issue until the presentation of Martinez evidence actually occurred. J.A. 2458. The district court allowed Teleguz to examine Jennifer Givens, one of his state habeas attorneys, in support of his Martinez claim. Givens was the only witness who offered testimony directly on the Martinez issue during the evidentiary hearing.

Givens readily admitted that neither she nor any member of her state habeas counsel team investigated the claim that Teleguz had been involved in a murder in Ephrata. She provided

41

no excuse for her error, noting that, "we clearly missed the issue" and that she would be "hard pressed to come up with a worse one than this because evidence that my client would have been involved in another alleged murder that was presented at the guilt and the penalty phase of a capital murder trial was unbelievably prejudicial." J.A. 2952.

Givens's revelation is significant in light of evidence that Teleguz's connection with an earlier Pennsylvania murder may not be as strong as originally conveyed. A Pennsylvania State Police law enforcement officer testified during the evidentiary hearing that a victim was murdered a short distance from Ephrata in Elizabeth Township, Pennsylvania, and that the murder was connected to purported organized criminal activity at the Ephrata recreational center. But the officer also testified that several people, not just Teleguz, were connected to activity at the Ephrata recreational center. Although Teleguz first came to law enforcement's attention during the Elizabeth Township murder investigation, the officer established that another individual was convicted for the murder. Teleguz was not present at the scene of the murder, and he was neither charged nor arrested in connection with the crime.

While Strickland does not impose upon counsel an obligation to "pursue an investigation that would be fruitless, much less one that might be harmful to the defense," see Harrington v.

42

*Richter*, 562 U.S. 86, 108 (2011), counsel must exercise "reasonable professional judgment" and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments," *Strickland*, 466 U.S. at 691. A single error, if "sufficiently egregious and prejudicial" can support an ineffective assistance claim, but the error must be measured against counsel's overall performance. *Richter*, 562 U.S. at 111. The record, as it currently stands, demonstrates only a single error on the part of state habeas counsel. Yet, in my view, given the testimony from Givens and the law enforcement officer, the error is significant enough to warrant further factual development.

B.

At this juncture, the record more clearly shows that Teleguz was prejudiced by the failure of counsel to investigate the alleged Ephrata murder. The district court assumed for the sake of argument that the performance of state habeas counsel was deficient, and concluded that, under prong two of *Strickland*, the deficiencies of counsel were not so prejudicial as to create a reasonable likelihood that the outcome of the case would have been different. The district court reasoned that any investigation by trial or state habeas counsel into the Ephrata murder claim would have concluded that Gilkes's

43

testimony was likely based upon a rumor that Teleguz was complicit in the Elizabeth Township murder. Teleguz, 2014 WL 3548982, at *25. The Warden adds that the sentencing outcome of the state trial could not have been different absent counsel's error because the jury sentenced Teleguz to death on two independent aggravating factors—vileness and future dangerousness. Absent the introduction of false evidence relating to future dangerousness, the Warden argues, the vileness factor would still stand. The majority relies on such reasoning, in part. I believe this approach overlooks important countervailing interests in a sober assessment of prejudice under the circumstances presented here.

An error of a constitutional magnitude occurs where a jury considers "as aggravation properly admitted evidence that should not have weighed in favor of the death penalty" and "where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor." Brown v. Sanders, 546 U.S. 212, 221 (2005) (emphasis omitted). Here, the evidence of the alleged Ephrata murder went only to future dangerousness, not vileness. Vileness requires the jury to find that the defendant's "conduct in committing the offense for which he stands was outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind or an aggravated battery to the

44

victim." Va. Code. Ann. § 19.2-264.2 (West 2015). Thus, evidence of an alleged prior crime would not be relevant for vileness, the only other aggravating sentencing factor the jury considered during the penalty phase, yet the jury may have improperly considered evidence of that alleged prior crime in weighing the propriety of the death penalty.

Essential to this conclusion is the idea that two independent aggravating factors equal more than just multiple legs to stand on if one breaks. The stakes here are high and the jury was tasked with a nuanced moral judgment; prejudice is inherent when an invalid aggravating factor is considered in combination with a valid one. However "vile" and therefore deserving of capital punishment the murder of Stephanie Sipe was under controlling Virginia law, the jury knew that the <u>actual killer</u> got a pass from the Commonwealth. Trial counsel's introduction of evidence of a murder in Ephrata, the circumstances of which are now known to be less straightforward than was suggested at trial, could very well have "skew[ed]" Teleguz's sentence toward the ultimate one. <u>Brown</u>, 546 U.S. at 221. For the prosecution, who portrayed Teleguz as a man who "solves problems" with murder, J.A. 5209, the implication was not just that Teleguz had previously been involved in taking a life, but also that he associated with unsavory characters who

45

also take lives. The Ephrata murder reference during the penalty phase most certainly had its desired effect.

Furthermore, trial counsel's error was significant. Teleguz's own counsel was the first to alert the jury that Teleguz may have been involved in a prior murder, even though the district court barred the prosecution from referencing the alleged murder during the guilt phase. The door thus opened, the prosecution then seized on the evidence during the penalty phase.

### III.

Given the "'heightened need for fairness in the administration of death,'" Teleguz should be provided an opportunity to develop fully the claims upon which he may be afforded habeas relief. Teleguz, 689 F.3d at 331 (quoting Callins v. Collins, 510 U.S. 1141, 1149 (1994)). I would find the district court's decision to preclude evidentiary development of Teleguz's Martinez claim an abuse of discretion, and I would remand for further proceedings.